IN THE CIRCUIT COURT OF THE 16TH JUDICIAL CIRCUIT
IN AND FOR MONROE COUNTY, FLORIDA

CASE NO. 2014-CA-596-K

NOTE CAPITAL GROUP VENTURES, LLC,

Plaintiff,

v.

WAYNE P. MASSON, et al.,

Defendants.
_______________________________/

# TRANSCRIPT OF PROCEEDINGS
# TRIAL BY COURT

| | |
|---|---|
| DATE TAKEN: | May 18, 2016 |
| TIME: | 9:03 AM - 2:33 PM |
| PLACE: | Freeman Justice Center<br>302 Fleming Street<br>Key West, Florida 33040 |
| BEFORE: | James M. Barton, II<br>Senior Judge |

This cause came on to be heard at the time and place aforesaid, when and where the following proceedings were reported by:

Amy Landry, RPR, FPR
All Keys Reporting, a U.S. Legal Support Company

Olde Towne Centre
9701 Overseas Highway
Marathon
305-289-1201

600 Whitehead Street
Suite 207-208, 2nd Floor
Key West
305-294-2601



Exhibit "12"

APPEARANCE FOR THE PLAINTIFF

D. RENEE JENKINS, ESQUIRE
D. Renee Jenkins, P.A.
199 East Flagler Street #378
Miami, Florida 33131-1103
service.jenkins@gmail.com

APPEARANCE FOR THE DEFENDANT

CATHERINE MUELLER, ESQUIRE
Law Offices of Samuel J. Kaufman, P.A.
3130 Northside Drive
Key West, Florida 33040
catherine@samkaufmanlaw.com

ALSO PRESENT
William Fogleman
Wayne Masson
Charles Licis

I N D E X

| | PAGE |
|---|---|
| PRELIMINARY MATTERS | 4 |
| WITNESS FOR THE PLAINTIFF | |
| WILLIAM FOGLEMAN | |
| Direct Examination by Ms. Jenkins | 18 |
| MOTION FOR LEAVE TO AMEND COMPLAINT | |
| By Ms. Jenkins | 80 |
| Response by Ms. Mueller | 85 |
| Response by Ms. Jenkins | 86 |
| Ruling by the Court | 89 |
| PLAINTIFF RESTS | 90 |
| MOTION FOR INVOLUNTARY DISMISSAL | |
| By Ms. Mueller | 90 |
| Taken Under Advisement by the Court | 91 |
| VOLUNTARY DISMISSAL | |
| By Ms. Jenkins | 96 |

EXHIBITS

| Plf's | Description | ID | Admit |
|---|---|---|---|
| 1 | Note | 33 | 34 |
| 2 | Mortgage | 33 | 34 |
| 3 | Purchase Agreement | 54 | |
| 4 | Assignments of Mortgage | 55 | 56 |
| 5 | Composite of correspondence | 56 | 66 |
| 6 | Loan History | 69 | 71 |
| 7 | FCI Lender Services, Loan Master Report | 72 | 77 |
| 8 | 4-24-14 Demand Letters | 77 | 78 |

(WHEREUPON, the following proceedings were had with all parties present:)

THE COURT: Note Capital v. Masson. Are we ready?

MS. JENKINS: Yes, sir. I'm sorry, may I have a quick moment to set up my laptop? I apologize to the Court.

THE COURT: Sure, that's okay.

(pause)

MS. JENKINS: Thank you, Your Honor.

THE COURT: Sure. We're ready for our trial in Note Capital v. Masson. Is the plaintiff ready to proceed?

MS. JENKINS: Yes. The plaintiff is ready to proceed.

THE COURT: And defendants are ready to proceed?

MS. MUELLER: Yes.

THE COURT: All right. A couple things. One, the other trial that we thought we had this morning is not here. They are off on another day. So you're it for this morning. So I think we will have time to get through everything. We might as well go ahead and swear in all of our witnesses now. So if you think you might testify this morning, please raise your right hand.

(William Fogleman, Wayne Masson, and Charles Licis were sworn, and all answered to the oath, "I do.")

THE COURT: I counted three folks raising their hands, so I think that was consistent with what we talked about the other day about the number of witnesses.

I saw in the pretrial statement that you both thought that you needed 20 minutes for an opening statement. But the way this kind of a case breaks down is where it looks like the defense is challenging the assignment of the mortgage and conditions precedent; right?

MS. MUELLER: Correct, with the standing.

THE COURT: It normally doesn't make a whole lot of sense to me in this type of a case, unless this is one of those unusual ones. Typically the plaintiff's witness is a records custodian or a loan analyst, testifying almost exclusively from records. Is that the case here?

MS. JENKINS: Yes.

THE COURT: Okay. So to me it doesn't make a whole lot of sense. Plus, you put in your pretrial statement the facts establishing the plaintiff's initial case. So it makes more sense in these cases from my standpoint, anyway, to hear first from the

defense as to what is exactly meant by what's wrong, and what hasn't been -- or thinks there is a weakness in the assignment. Now, it says "assignment of a mortgage." Do you mean assignment of the note and the mortgage?

MS. MUELLER: Yes.

THE COURT: And what you mean by that is typically, "Yes, Judge, the original note says it started with A and ended up with D. And what we don't think they have shown is that transfer from B to C or C to D."

MS. MUELLER: That's part of it. There is a little bit more.

THE COURT: I know. And you can flush out the little nuances of that, along with what conditions precedent you think they aren't going to be able to establish. And then they can give me a little hint, "Well, Judge, you know, we think the documents that are coming in are going to show that," or "Our witness is going to be able to tie that all together," or whatever that is. And then we can get right into it, so that both sides know what they're focusing on.

And then after I hear briefly what the issues in the case are and how they're going to be addressed by way of evidence, then I will ask you about the

exhibits that we talked about last time, about how you decided to deal with those, and which ones might be still up in the air in terms of objections. Okay?

MS. JENKINS: Excuse me, Your Honor, if I may briefly interject. The parties wanted to advise the Court that we are in the middle of a settlement discussion, just for the Court's edification, not to get into the details, obviously.

THE COURT: No, that's fine.

MS. JENKINS: But we are -- plaintiff is still pending confirmation of whether the defendant's proposal will be accepted or not. Plaintiff's witness does have settlement authority. However, the nature of the settlement does require a supervisory level.

THE COURT: Yes, up the chain.

MS. JENKINS: Yes. So I don't want to take away from the present witness's authority to settle, but it is a different level. So we did want to advise the Court of that. Obviously we're ready to move forward in light of the pending phone call.

THE COURT: Yeah. And to make an exception, who is -- who is the person that asked to approve it up the chain going to call to let you-all know one way or the other?

MS. JENKINS: They will either call Mr. Fogleman;

they will either call the plaintiff's firm of record, South Milhausen, which is located in Orlando, and they will contact me; or they may call me directly. It could be either the three of me, him, or the law firm.

THE COURT: And did they say -- and they know we're going to trial today?

MS. JENKINS: They do. And this was a settlement proposal -- we were in discussions yesterday.

THE COURT: Sure.

MS. JENKINS: Yesterday, you know, throughout the day. So -- or throughout the afternoon, early evening. So -- and there is a time zone issue. So we just wanted to advise the Court that that's going on in the background.

THE COURT: Which time zone are they calling from?

MS. JENKINS: This is California.

THE COURT: It's 6:00 in the morning.

MS. JENKINS: For what it's worth, that's going on in the background. But we are still ready to move forward.

THE COURT: More than likely, somebody is not getting up at 6:15 California time to make a call.

MS. JENKINS: More than likely. I wish they would. That would be nice.

THE COURT: Anyway, in violation of one of my down-in-the-sand rules, if you need to have your cell phone out and on vibrate or something, just if and when a call comes in, you won't have to, when we take a break, you know, see that they called a half-hour before or something like that.

MS. JENKINS: Okay.

THE COURT: All right. So let's press on, and we will see how far we get. So from the defense, go ahead and identify yourself for the record, and then indicate the defenses that you're going to be presenting.

MS. MUELLER: Catherine Mueller on behalf of defendants Wayne Masson and Charles Licis, L-i-c-i-s. Our defenses focus on whether or not the current plaintiff has standing to bring forward this action. We will produce evidence that shows that there are three original promissory notes, multiple allonges of the note that have not been attached to the version of the note that was filed in this action, in addition to conflicting assignments of the mortgage that are actually already attached to plaintiff's complaint as Composite Exhibit C.

With regard to the conditions precedent, my clients actually on their own attempted to dispute the debt directly with Note Capital Group, to which they

never received a response. And that in a nutshell is what our defenses are.

THE COURT: So how would you characterize that condition precedent?

MS. MUELLER: If they did not verify the debt as requested, then they shouldn't have brought forth the action. They would have had to verify the debt and then move forward. But they ignored the request to do so.

THE COURT: Meaning what?

MS. MUELLER: Meaning Note Capital never responded to their request to verify the debt, identify the true owner of the loan.

THE COURT: Okay, I gotcha. As opposed to, "We think we're up to date. Why are you writing us this letter saying, 'We want your money'?"

MS. MUELLER: Correct.

THE COURT: All right. So go ahead and identify yourself for the record. And then how you plan to address the defenses.

MS. JENKINS: Good morning. Renee Jenkins on behalf of the plaintiff. As to the standing arguments, specific -- I will go through each of them. But as to the verification of debt, it's plaintiff's argument that the debt was verified in the verified complaint,

to which a verification was attached to the complaint, which corresponds with the exact same information that was requested.

THE COURT: Okay. So this almost sounds like a -- because really I think you're conceding that while they may have sent the plaintiff a letter saying, "Verify the loan," you're saying that the response to that was the verified complaint, but not before the complaint.

MS. JENKINS: Well, there was almost --

MR. FOGLEMAN: May I?

THE COURT: You may.

(Discussion off the record.)

MS. JENKINS: In addition to the facts provided in the verified complaint, our witness, Mr. Bill Fogleman, is also -- will also be here to testify as to the correspondence he sent in response to the request for verification. I believe it's three different letters, specifically verifying the debt and all the information. And we do have -- we will be able to present these -- we will submit these as -- proffer these as evidence.

THE COURT: Okay.

MS. JENKINS: And these were actually sent by Mr. Fogleman himself.

THE COURT: And then the -- on the assignment

issue, is the plaintiff prepared to show the assignment chain, as I call it?

MS. JENKINS: Yes. We will show the assignment chain, the disputed -- the defendants are disputing the validity of a particular transfer. We will show -- we will present to the Court case law that is still valid regarding equitable transfer, and case law that is still good law regarding the note and mortgage -- the transfer of a note and mortgage being able to pass in equity, even without an assignment.

We have case law -- we have multiple cases to this effect, in addition to showing the assignment of the chain -- chain of assignments, which is specifically six different assignments.

THE COURT: Okay. What about plaintiff's exhibits? I know you-all went over them. Any kind of agreement reached on how you're going to treat the exhibits?

MS. JENKINS: We have gone over them all and have labeled them. There is -- we did, according to the Court's instructions, remove certain exhibits in response to the order on the motion in limine. Plaintiff's motion in limine, excuse me. So -- and we've -- I have seen -- we have seen each other's exhibits. I will have an objection to a pictorial time

line that defendant's counsel plans to present. Otherwise, we've gone through all of the exhibits.

THE COURT: Okay. And then are there many objections to plaintiff's exhibits, do you recollect?

MS. MUELLER: I don't necessarily have many objections to their exhibits. I'm actually using a lot of the same things.

THE COURT: And then I heard you're going to have a pictorial?

MS. MUELLER: I do. It's a summary, actually, of the Plaintiff's Composite Exhibit C that was prepared between my client and myself.

THE COURT: Right. Typically, especially in a jury trial, but even in a bench trial, I would consider something like that, a time line summary, as a demonstrative. Whether you want it in evidence or not, usually demonstratives don't come in as exhibits. But they are very helpful to me to see, "Okay, I see that's how you view it." And then the other side can either do their own, or pick holes in your time line.

So I'm going to use it, one way or the other, whether it's an exhibit or not. And just because I look at it doesn't mean I'm going to accept everything in it as established, or much less conclusive of anything.

MS. MUELLER: And I'm okay with using it as a demonstrative aid. I think it will be very helpful with looking at the different dates.

THE COURT: If nothing else, it helps me follow somebody's argument. And then I can say, "They're right." Or, "They're right except for" this, that, or the other.

Okay. So are we ready to have our witness from the plaintiff?

MS. JENKINS: Yes, Your Honor.

THE COURT: Okay. Plaintiff may call its first witness.

MS. JENKINS: Just as a matter of housekeeping, does the Court prefer us to sit, or stand at the podium, or --

THE COURT: In a non-jury setting, whatever is more comfortable for you. It might be better, because there are going to be documents for the witness, to go ahead and testify from the witness stand so that he is accessible to both sides. And he can deal with whatever documents he is going to be looking at.

MS. JENKINS: Well, if the Court doesn't mind, we can stay in our seats.

THE COURT: Counsel?

MS. MUELLER: Your Honor, I don't have any issue

with that.

THE COURT: Okay, that's fine, as long as we make sure that the court reporter is able to hear everything. We're all pretty close here, so that shouldn't be a problem. I'm sure she will let us know if she doesn't hear something. She will raise her hand or let us know one way or another.

MS. JENKINS: Your Honor, does the Court want to address the supplemental case law the parties are ready to submit regarding the defendant's motion in limine for the technical admissions? At the pretrial conference, Your Honor advised that you would take the matter under advisement.

And I do have case law in support of plaintiff's argument that while the technical admissions are -- it's not disputed that there are technical admissions. However, I do have case law to present that holds, despite the technical admissions, that it's strongly encouraged for matters to be decided on their merits. And especially in cases where there is -- there are facts contradictory to the technical admissions that are in the verified complaint and other pleadings and other documents.

THE COURT: And of course, we're here somewhat beyond mere technical admissions, because we have an

order essentially adopting those technical admissions, as opposed to -- and I've been in trial, and we will be in the middle of some witness, and somebody will try to get something out of a witness. And the other side will say, "Well, Judge, that's covered by these requests for admission we sent out a year ago, which they never responded. And by operation of law, they are deemed admitted. So we object to this testimony." And that's when I think the cases you're talking about might kick in.

In our case, actually you've already had that hearing, and it is an interlocutory or non-final order. So I think what you're really talking about at some point is an ore tenus motion for rehearing of that order; correct?

MS. JENKINS: Well, not exactly.

THE COURT: Because I mean, as long as that order is in effect, I mean, that's too bad.

MS. JENKINS: No, I'm not disputing the existence of the order, obviously. But the cases that I want to present to the Court, there is some discussion as to -- especially in those situations where the plaintiff -- or the party, but in this case the plaintiff did file a motion for relief and was denied, and did subsequent -- and in filing for that motion for relief did file

proposed admission -- proposed responses to the request for admissions.

THE COURT: And you've done that here?

MS. JENKINS: Yes. And those --

THE COURT: Well, rather than -- and that's kind of an interesting legal discussion, which I enjoy. But on the other hand, let's get into the testimony. And then as something comes up that you're going to elicit from your witness or some document, then we can have the defense say, "Judge, we object. That's one of those that's covered by the request for admissions that we sent out, and it's covered by that order."

Because sometimes we get into a case, and it's like, you know, it never comes up, because what was admitted or denied, or whatever, was admitted by silence in this order now isn't a particular issue in the case. And you probably know which ones those are, or are ones that you aren't even concerned about. You know what I mean? So let's go ahead and get into the testimony and see how that develops.

MS. JENKINS: Thank you, Your Honor. I would like to call Mr. William Fogleman as plaintiff's first witness.

THE COURT: Spell your last name, please.

THE WITNESS: F-o-g-l-e-m-a-n.

WILLIAM FOGLEMAN

was called as a witness and, having been previously duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. JENKINS:

Q Mr. Fogleman, where are you currently employed?
A SN Servicing Corporation.
Q And what is your position at SN Servicing Corporation?
A I'm general counsel.
Q And please, as general counsel, please describe the duties and responsibilities that that entails.
A I'm involved with the -- the review of litigated matters. I represent the company as the corporate representative for matters where we are involved in litigation as a defendant, also in matters where we're involved as the servicer for the investors that we represent in litigated matters.
I'm also involved with our compliance. I'm responsible for responses to qualified written requests. I'm responsible for reviewing documents and correspondence received by the servicing company, in addition to other contracts and dealings with investors and third parties on behalf of the servicing company.
Q What is your relationship to the plaintiff in this

matter?

A SN Servicing Corporation is the servicer for the plaintiff.

Q Now, are you familiar with or have knowledge of SN Servicing Corporation's business practices with regards to the mortgage loans it services?

A Yes.

Q Okay. Now, is it in the regular business practice to record payments from the borrower?

A Yes.

Q And would these records have been made at or near the time of the event described in those records?

A Yes.

Q And would those records be prepared by an agent of your organization?

A Yes.

Q Does that agent have a duty to prepare those records?

A Yes.

Q And would those records have been kept in the ordinary course of regularly conducted business?

A Yes.

MS. MUELLER: I'm going to object to the extent that he is attempting to testify as to somebody else's job duties, outside of whatever his job duty is with

the servicer, and whether or not he is the person who has the most knowledge.

THE COURT: I understand the words you're using, but what's the legal basis of your objection?

MS. MUELLER: He doesn't have a personal knowledge. It's hearsay what that other individual's duties are, and what they do to prepare the records of the trial.

THE COURT: Let me reserve ruling on that until it's established what his function is in the company relative to his knowledge of other employees, and what his role is with regard to those other employees.

Q Are there standards and requirements in place for making sure that the input of information is done contemporaneously with receipt of the funds?

A Yes. We have written policies and procedures as far as payments, receipts, and applications.

Q And you're familiar with those written policies and procedures as general counsel of the servicer?

A I am.

Q Now, are there safeguards in place to ensure that this information is accurately inputted and verified?

A Yes.

Q Is access to the computer system limited so that data that is inputted -- that the integrity of the data is

preserved?

A Yes.

Q Now, is there a department with employees whose regular job function is to maintain the computer system to ensure that it's functioning properly?

A Yes.

MS. MUELLER: I'm just going to have a continuing objection to him testifying that he is ensuring that other individuals are entering things in accurately, based on lack of his personal knowledge of what other employees are doing.

THE COURT: All right. Can you have him explain what his relationship is to these other employees?

MS. JENKINS: Sure.

Q Mr. Fogleman, as general counsel of the servicer, what is your relationship to the employees that are responsible for record keeping?

A I mean, personally, I am and was involved in the drafting of all of our written policies and procedures. On a daily basis, I interact with our employees in the payment department as far as records, reviewing those records. I have access to those records myself and review them. I personally reviewed the records of every case that I've been involved with as far as a litigated matter. And I have access to all of the records that they receive as far as

payment input.

Q So you have personal information -- excuse me, personal knowledge as to the -- your testimony regarding the records for this particular loan?

A Yes, I do. I mean, although I may not actually receive the payment myself and enter it into the system, I have -- I have interactions with people that do, and I have access to all of the records that they keep as far as payment records.

Q And the policies and procedures that govern the employees and -- these particular employees that deal with record keeping that you were involved in creating and maintaining, are these procedures used for training as well?

A Yes.

THE COURT: What's the physical layout of SN?

THE WITNESS: We have -- basically we have two offices. We have one that -- we consider them like east coast and west coast. The west coast office is in Eureka, California. And our office actually is in Baton Rouge, Louisiana.

THE COURT: A whole building, or a floor?

THE WITNESS: Oh, no. We have the whole building in both. We have different personnel in each office as far as servicing duties for the company.

THE COURT: And are you primarily out of the Baton

Rouge office or the California office?

THE WITNESS: Baton Rouge.

THE COURT: And the records pertaining to this loan are in the Baton Rouge office?

THE WITNESS: The records -- all of our records are kept on a servicing system. We call it our AMS system. But all of them are kept on that system. And they're entered by -- of course there are going to be different people that enter the records, depending on when they are entered and what they are entered for. In the case of payments, of course, there is a payment department.

Payments are received normally through either a lock box, or they can be made like a payment by check, by phone type of payment, or they can be received by wire. Each one of those forms of received payment are verified by that department before they are entered into the system. And there is a date showing, you know, the amount, and the date that that payment was received. And of course the account that it's given for.

THE COURT: Okay.

MS. MUELLER: I would like to just object to allowing him to testify to anything that happens in the Eureka, California office, as he would not have

personal knowledge of what goes on in that office, or oversight of any of the employees in that office.

THE COURT: All right. In my view, the witness has demonstrated by virtue of his position with the company what he has described as his job duties and familiarity with his company, that while like most records custodians, at least beginning in the mid-20th century, he isn't looking over people's shoulders to see what they enter, when they enter it into records, much less now when it's all electronic.

That's not I don't think required for a records custodian to come in and testify about the customs and practices of a business and the way the records are kept. There is no requirement that each records custodian witness has to have that kind of minute knowledge that -- I don't think any records custodian has these days. So I'm going to overrule your objection. You may continue, Counsel.

MS. JENKINS: Thank you, Your Honor.

Q How does SN Servicing Corporation acquire the loans it services?

A Well, we -- with each investor, we enter into a -- of course, we meet with them and discuss what they need. And then as a servicing company, then we enter into a servicing agreement with that investor, which outlines the

duties and responsibilities of the servicing company on behalf of the investor.

Q And can you explain for the Court the process by which the loans are verified for accuracy?

A Well, once we have entered into a servicing agreement, and then the investor will provide us with all of the information on the loans, which would include copies of all of the collateral documents, which we consider to be such as the note, the mortgage, and the assignments. And all of the servicing records which show past payment histories, past interactions with the borrower, any information which they have from a prior servicing record. All of that is reviewed by our boarding department, and then it's entered into our system for reference.

Q Okay. Does SN Servicing Corp., also referred to as SN, does SN service performing and non-performing loans?

A Yes.

Q Are all the records associated with the loans kept and maintained in the regular course of business activity?

A Yes.

Q Are you familiar with the loan -- with the borrowers of this particular loan, Mr. Wayne Masson and Charles Licis? Please tell me if I'm pronouncing that correctly.

MS. MUELLER: That's correct.

Q Mr. Charles Licis?

A Yes.

Q Now, have you reviewed all the account records and documents associated with this loan?

A Yes, I have.

Q And it's your testimony that regarding this loan, all the records associated with it have been verified and kept by SN in accordance with the same business practices and procedures that you have testified about?

A Yes.

MS. JENKINS: I would like to refer the witness to the collateral docs, which will be the note, the mortgage, and the assignment of mortgages.

THE COURT: Okay.

MS. JENKINS: Opposing counsel already has her copies. Your Honor, do you need -- would you like me to provide you with a copy?

THE COURT: Not yet.

MS. JENKINS: I'm handing the witness a copy of what's labeled Fixed Adjustable Rate Note.

MS. MUELLER: Just for the record, I'm going to object to whatever she is handing him, based on whether or not it's an original, if the original has been entered into the court file or not. We believe that there are three versions of this note, so I don't

really know which version she is handing him.

THE COURT: I thought she asked you if you had a copy of it.

MS. MUELLER: I do. But this is like the second version that they have filed in this case. So whichever version --

MS. JENKINS: I can clarify, Your Honor. The original note has been filed with the clerk. And this is a copy of the original note, with indorsements on the next-to-last page.

THE COURT: Do you have the date that the original note was filed in the court file?

MS. JENKINS: Yes, Your Honor. I apologize, I don't have it memorized, but I do have the date. (pause) The Notice of Filing Original Note and Mortgage were filed on January 30, 2015. And the clerk is in possession of the original note -- excuse me, yes, 2015. This image is the image of the note which is attached to this Notice of Filing Original Note and Mortgage is what I have handed to the witness.

THE COURT: Okay. The Notice of Filing is dated January 30, 2015. Its "filed" date by the clerk is February 4 of 2015. So Counsel, have you looked at that in the court file?

MS. MUELLER: I have seen it in the court file.

THE COURT: Okay.

MS. MUELLER: No, I have not, I'm sorry. I have seen it as it's filed and served on me. I have not seen what's in the court file.

THE COURT: I mean, it's here, if at some point you want to look at it. So this is a note that's dated April 15, 2005. Is that --

MS. JENKINS: Yes, Your Honor.

THE COURT: Okay. So --

MS. MUELLER: May I look at it now?

THE COURT: Yes, if you want to.

MS. MUELLER: May I approach?

THE COURT: Sure.

(pause)

MS. MUELLER: All right. Thank you.

THE COURT: Sure. So I think the objection is that there may be two or three different versions of this note.

MS. MUELLER: With different indorsements.

THE COURT: Okay, fine. But just because something comes into evidence doesn't mean ultimately it will be determined that that was the note that exhibited what -- the Court's exhibit. But I'm going to overrule the objection. Are you going to admit it into evidence, or is he just identifying it now?

MS. JENKINS: I'm going through the statutory requirements now.

THE COURT: Okay.

MS. JENKINS: Just for purposes of the record, I don't know the Court's preference, but I can go through them collectively or individually. But I was going to go through them by the statute in terms of the business records exception for each of the collateral documents. Or I can do them collectively.

THE COURT: Give it a try collectively, and see if that works.

MS. JENKINS: Okay. Next I'm identifying and referring to a copy of the mortgage, and handing that to Mr. Fogleman.

MS. MUELLER: There is also actually two versions of the mortgage.

THE COURT: Okay.

MS. MUELLER: I'm not sure which copy she is handing to the witness.

MS. JENKINS: I'm handing the copy of the original, which was filed with the court. So -- in that same filing. So if Counsel wanted to look at the original mortgage at this time as well, it's a copy. And she is more than welcome to --

MS. MUELLER: Is it the same copy as you have used

as an exhibit on your exhibit list, that I guess they provided to us prior to trial? There is no stamp.

MS. JENKINS: Yes. It's the copy that has the Official Records stamp.

MS. MUELLER: Right.

MS. JENKINS: Yes.

MS. MUELLER: May I see what's in the original court file?

THE COURT: Sure. The mortgage, you mean?

MS. MUELLER: Yes, please. I actually just need the front page. (pause) Thank you.

THE COURT: Sure.

Q So collectively with the note and mortgage, based on your review of the records for this particular loan, were these documents made at or near the time of the events they describe therein?

A Yes.

Q Now, were they made by a person with knowledge, or from information transmitted by a person with knowledge of the acts or events?

A Yes.

MS. MUELLER: I'm going to object. Can he -- can you specify, are we talking about the creation of the mortgage?

MS. JENKINS: I'm referring to his capacity to

testify to the note and the mortgage as a business record exception. So to do that collectively, as opposed to individually, then we will move on to -- plaintiffs will move on to the assignments.

MS. MUELLER: When you say "at or near the time of the event," which event are you referring to?

MS. JENKINS: The execution of the documents.

MS. MUELLER: I will object that he has personal knowledge when the documents were executed. He wasn't present.

THE COURT: Yeah, I will sustain that. He can say when he or his company got the documents. But I don't think he is saying that he or anybody from SN was there at the closing back in April of 2005. Or maybe they were. I don't know.

THE WITNESS: No.

MS. JENKINS: No. I'm just eliciting testimony regarding the business record, these documents as business records.

THE COURT: Yes, they came into his company's possession in the normal course of business?

MS. JENKINS: Exactly, based on his review of the loan documents.

THE COURT: When that was, he may or may not know. But he can't go back in time to 2005 and say, "Yeah, I

saw the defendant sign the note and the mortgage."

MS. JENKINS: No, he can't. But he has testified as to the boarding process.

THE COURT: Yes, that's fine. I understand that distinction and that limitation. You may proceed.

Q All right. Is it the regular practice of SN to keep such documents as notes and mortgages in their business records?

A Yes. We keep -- and we keep, you know, scanned copies of all the documents that are received when the servicing file is transferred to us.

Q And based on your review of these business records, who executed the mortgage for this loan?

A Wayne Masson and Charles Licis.

Q And based on your review of these records, who executed the note for this loan?

A Wayne Masson and Charles Licis.

Q And you know this because you're looking at the signature?

A Yes.

Q The signature pages? Okay.

MS. JENKINS: Your Honor, I would like to have the plaintiff's -- excuse me, the note and the mortgage submitted as evidence.

THE COURT: How?

MS. JENKINS: As exhibits.

THE COURT: Separate, or Composite Exhibit 1?

MS. JENKINS: We can do the note as Exhibit 1 and the mortgage as Exhibit 2, because I know there are those objections to them.

MS. MUELLER: I object as they're being -- this was not the version of the note that was filed with the complaint. It came into the Court's hands after the filing of the complaint, with different indorsements.

THE COURT: Right. Which, to make an observation, seems to be the rule in these foreclosure cases, as opposed to the exception.

MS. MUELLER: That the document can be altered after the filing of the complaint?

THE COURT: Different -- no, they are not necessarily altered. But copies that a lawyer has when he filed the complaint is what they and their client have come up with when they file the complaint. Then it seems like a year or two, sometimes three or four years into the complaint, the original shows up, and it's got all kinds of stuff on it. Indorsements and allonges are attached.

So as a basis for objecting to admissibility, I'm overruling it. But certainly it's a point of argument if you are able to present different versions,

or show that even the plaintiff has presented different versions of this. And then we're left with maybe at the end of the day, "Well, which one is it?" You know, "What happened? Why is this here, and why has this been added?" So I understand your point, but I don't see that as a reason not to allow these exhibits in evidence.

And if you're sure that the copies you want in evidence are copies of what has been filed in the court file, and the Court has the original of the note and mortgage, I will allow them as your Exhibits 1 and 2, with the understanding that the original of exhibits 1 and 2 are in the court file with this notice of filing.

MS. JENKINS: Yes, Your Honor.

THE COURT: So you need to mark them in, Madam Clerk?

THE CLERK: Yes.

THE COURT: Do you have them for the clerk to mark in as admitted? The note is Exhibit 1 for the plaintiff. The mortgage is Exhibit 2.

(Plaintiff's Exhibits 1 and 2 were received in evidence.)

MS. JENKINS: Thank you. If I may approach?

THE COURT: Yes.

MS. JENKINS: I'm handing Mr. Fogleman what -- a composite exhibit, including the assignments of mortgage. For the record, it is a number of six assignments that I will go through in detail.

I have handed Mr. Fogleman six assignments of mortgage.

Q The first, Mr. Fogleman, can you advise the Court of the nature of the first assignment?

A The first assignment is from Mortgage Electronic Registration Systems, Inc., to Wells Fargo Bank, NA.

Q And that assignment is dated when?

A November 8, 2011.

Q Okay. We can turn to the next assignment.

THE COURT: Now, we're talking about the note now, or the mortgage?

MS. JENKINS: I'm sorry. Now we're talking about the assignments of mortgage. I apologize, Your Honor.

THE COURT: Okay.

MS. JENKINS: I do have an extra copy.

MS. MUELLER: I have a copy. I'm all set.

THE COURT: I don't need one right now.

Q So Mr. Fogleman, you just identified the first assignment. Now we're on the second assignment. Can you identify the second assignment, please.

A Second assignment is from Wells Fargo Bank, NA, to

Newbury Place REO, Roman numeral III, LLC.
Q And the third assignment?
MS. MUELLER: I'm going to object on the basis that I would like for the witness to enter into the record the date that that assignment is dated.
THE COURT: Okay. Fair enough. Both of them, or just this last one?
MS. MUELLER: No, this one. Remember the date of the first one.
MS. JENKINS: The witness is going to testify to the dates of all of them.
THE COURT: I know, but he might as well do it while he is talking about it. So when was the one from Wells Fargo to this Newbury?
THE WITNESS: It's dated September 8, 2011.
THE COURT: Okay.
Q For point of clarification, we will go back, just to be consistent. If I can refer you back to the first assignment, that is dated November 8, 2011, from MERS to Wells Fargo. When was that assignment recorded?
A December 9, 2011.
MS. JENKINS: For the Court's reference, the plaintiff will be presenting case law as to whether assignments of mortgage -- under what circumstances assignments of mortgage need to be recorded. So the

witness will be testifying to assignments of mortgage, some of which are recorded; some of which are not.

THE COURT: Okay. Is that an issue?

MS. MUELLER: It becomes an issue.

THE COURT: I mean, what --

MS. MUELLER: They're playing with the recording dates, is what this is leading up to. They want you to think that was the first mortgage assignment, but it wasn't. Because as you just heard, the second was dated before the first.

MS. JENKINS: Plaintiff objects to the reference that it's playing with dates. The dates are -- everything is on its face.

THE COURT: Well, I thought I did hear that this one was November of 2011.

MS. JENKINS: Yes.

THE COURT: And that's supposed to be the second one, which to me means it happened after the first one, was dated before the first one.

MS. JENKINS: And the witness will testify as to the circumstances surrounding that.

THE COURT: Okay, that's fine. But that's obviously an anomaly that will have to be --

MS. JENKINS: Definitely. I just wanted to object to the characterization of --

THE COURT: Right. If we had a jury, this discussion wouldn't be going on. But I mean, it's helpful to me to keep an eye on what the issues are. So that's good.

Q Mr. Fogleman, back to the first assignment dated November 8, 2011, from MERS to Wells Fargo. Can you please explain -- describe to the Court the nature of MERS and its capacity as to loan origination.

MS. MUELLER: I will object just on the basis that he has not been qualified as an expert to testify with regard to the nature of MERS. And there has been no foundation laid for this.

MS. JENKINS: If I may reply, the witness will give -- as general counsel for the servicing company, he has already testified as to the -- his -- how well-versed he is in the policies and procedures, since he has written a lot of them.

THE COURT: I haven't heard anything specifically about what he knows about MERS, and how he came to know about it. So I think you do have to establish the basis of his knowledge of MERS.

MS. JENKINS: Certainly, Your Honor.

Q Mr. Fogleman, in your capacity as general counsel at SN Servicing Company, what is your interaction as relates to loan documents with MERS, the registration company?

A Well, I guess two -- I'm not sure I'm going to answer this right. But two reasons. One, SN Servicing Corporation is actually a member of MERS. MERS is a Mortgage Electronic Registration System that acts on behalf of certain investors to hold as a nominee the mortgage for registration purposes only, when they are acting to file the mortgage in the public records. We are a member of MERS, and we are -- we have the capacity to do that, also. As a member of MERS, we are required to maintain and update our policies with their policies and procedures, which we do.

In addition, I mean, we have a number of loans that we service that are involved with MERS. We are very familiar with their system, and actually have familiarity with the standing of MERS as far as what their purpose is and how they interact as far as assignments and even litigation.

We're also required as a member to maintain updates as far as any standing issues or litigation issues for MERS throughout the country, actually.

Q So in your capacity as general counsel, you interact on a regular basis with MERS?

A Yes, I do.

Q Okay. And that would provide the basis for your personal knowledge as to their policies and procedures and capacity as a registration company?

A Yes.

Q So referring to the first assignment of mortgage dated November 8, 2011, from MERS to Wells Fargo, we have already -- you have already testified that the subsequent assignment of mortgage predates the MERS assignment of mortgage. Can you give some -- can you provide some detail to the Court as to why this is not necessarily uncommon?

A Well, in this instance, this is a mortgage that when it was originated, actually MERS was named in the original mortgage as the nominee for the investor, which was at that time Wachovia Mortgage Corporation. So as the nominee, they were the ones that filed the mortgage in the public records on their behalf. And they were engaged to act as their nominee.

However, I mean, that being said, as their nominee, they are not the lender. The lender is specifically stated in the mortgage, which is Wachovia Mortgage Corporation. So the assignment from -- from MERS out into Wells Fargo is actually moving the -- MERS -- let me back up. I'm not trying to talk over myself.

But MERS actually has a policy and procedures that will not allow its members to file foreclosures in its name. That's because MERS is not the investor. MERS does not hold the note. It does -- you know, it's not the party that's the -- as far as the note is concerned, the party in

interest. So as a policy, although they are allowed to be the nominee of public record, they are required to move the mortgage out of their name into the investor's name on whose behalf they are acting before any foreclosure action can happen, or any collection action whatsoever. MERS does not allow that to be done in their name. They are not the party that should be bringing the action for foreclosure.

So in this instance, MERS moving it to Wells Fargo, and then there being an assignment from Wells Fargo into Newbury is actually the same parties acting in the same capacity, because MERS is acting on behalf of Wells Fargo in this case to -- I don't mean to give you more detail than you want to know. But in this case, Wachovia Mortgage Corporation was subsequently merged into Wells Fargo Bank by an act. So they are actually the same party in interest.

MS. MUELLER: I object to the extent that he is attempting to intertwine any kind of a legal argument on behalf of the legal effect of these mortgage assignments.

THE COURT: All right. Well, whatever was argument, I mean, I can sift through all that. But I think he is trying to explain what MERS's role is in all these types of cases, which for better or worse, whoever dreamed this scheme up, if they would have just stopped with MERS, MERS is the nominee for the lender,

okay, fine. But then they said in bold, "MERS is the mortgagee."

So you know, you can say it's just a nominee, but the fly in the ointment, at least in Florida -- I don't know how the other states deal with it. If you're the mortgagee, it's your mortgage. And you can be the nominee for anybody else. But that's why MERS has to assign it out at some point, if somebody else is going to bring the lawsuit, because the mortgage identifies who the mortgagee is, and it's MERS.

So they can be a nominee. They can be an agent. They can be whatever they want to call themselves. But by law and by the mortgage itself, MERS is the original mortgagee.

So I understand what you're saying, but that's why there's got to be an assignment from MERS to somebody, if somebody else is going to bring a lawsuit. So you may continue.

MS. JENKINS: Thank you, Your Honor.

Q So -- okay. Just for clarification, the -- back to the second assignment, which is dated September 22, 2011, from Wells Fargo to Newbury Place REO III, LLC, this assignment was recorded on which date?

A March 20, 2012.

Q And again, not -- it's not plaintiff's position

that -- because there is case law in support of that mortgages -- excuse me, assignments of mortgage need -- only need to be recorded under certain circumstances. However, for the purposes of establishing -- since we're discussing the order of assignment between MERS, Wells Fargo, and the subsequent assignee, Newbury Place REO, please clarify whether the second assignment was recorded after the first assignment.

A Yes, it was.

Q And moving to the third assignment, can you describe that assignment for the Court?

A It's from Newbury Place REO, III, to Newbury Place Ventures, III, LLC.

Q And the fourth assignment?

A It's from Newbury Place Ventures, III, to Goshen Mortgage, LLC.

Q And the fifth assignment?

A It's from Goshen Mortgage to GDBT-1 Trust 2011-1.

Q And the sixth assignment?

A It's from Goshen Mortgage, LLC, to Note Capital Group Ventures, LLC.

Q And for point of clarification, I do apologize to the Court, I forgot to request the dates. So going back to the third assignment from Newbury Place REO -- excuse me. The fourth assignment, Newbury Place Ventures, LLC, to

Goshen Mortgage, LLC, what is the date on that one? And that's the fourth assignment.

A September 3, 2013.

Q Okay. Moving to the next one -- and for the record, the fourth assignment is not recorded. For the next assignment, the fifth assignment, from Goshen Mortgage, LLC, to GDBT Trust, what is the date for this one?

A November 6, 2013.

Q Okay. And that is not recorded as well. For the sixth assignment, that is from Goshen -- oh, can you tell the Court the details of the assignment?

A The last one is from Goshen Mortgage, LLC, to Note Capital Group Ventures, LLC.

Q And the date on this assignment is?

A February 28, 2014.

MS. MUELLER: At this point, Your Honor, I wanted to bring to the Court's attention that there are two mortgage assignments from Goshen to two different entities, one of which is the plaintiff. At the point in time that Goshen attempted to reassign the mortgage, it no longer had the right to do so. On that basis, I would move for an involuntary dismissal.

THE COURT: Well, that sort of a motion has to be based on evidence.

MS. MUELLER: They just went over the evidence.

THE COURT: Not that -- I don't think they talked about that other assignment from Goshen to somebody else.

MS. MUELLER: They did. GDBT. It's dated November 6, 2013.

THE COURT: Okay. So I guess they will explain that. Typically a motion for involuntary dismissal is made at the end of the party's case, not in the middle of it.

MS. MUELLER: It's worth a shot.

THE COURT: Why not? No harm in asking. But I will deny it at this time without prejudice to let you make the motion again at the end -- as they rest or after they rest.

MS. JENKINS: Thank you, Your Honor.

Q Referring to the set of assignments of mortgage you just testified to, have you -- did you have an opportunity to review these records as relates to this particular loan?

A Yes.

THE COURT: So there were two assignments from Goshen, one to the plaintiff, and one to somebody else?

MS. JENKINS: Yes, Your Honor.

THE COURT: Which was first?

MS. JENKINS: The first one is the --

THE COURT: In point of time.

MS. JENKINS: The first in point of time is dated November 6 -- just for clarification, 2013, because it's a lot of assignments. November 6, 2013, from Goshen Mortgage, LLC, to GDBT Trust.

THE COURT: Okay. And then the one to the plaintiff from Goshen was --

MS. JENKINS: That is September -- excuse me, February 28, 2014. And that is also from Goshen Mortgage, LLC, to the plaintiff.

THE COURT: So I guess now having been tipped off as to what that might mean, I guess you're prepared to have your witness explain that.

MS. JENKINS: Yes, Your Honor, to the best of his ability. And I also have case law regarding this issue as well.

THE COURT: Okay. Let's develop the facts first, and then we will talk about case law at the end of your case.

MS. JENKINS: Okay.

Q Mr. Fogleman, in your capacity as general counsel for SN Servicing Company, do you see different entities acting on behalf of holders of the note?

A Yes.

Q And would that be in terms of these entities

acting as agents or trustees or in-house servicers, if you will? Would it be different capacities?

A Yes.

Q Okay. In your review of the subject loan documents -- and right now we're discussing the fifth and sixth assignment, particularly from Goshen Mortgage, LLC, to GDBT Trust. And then the subsequent one also from Goshen Mortgage, LLC, to Note Capital, the current plaintiff in this matter. Can you provide any general information to the Court regarding why sometimes different entities are selected as trustees, if you will, or agents to hold the note?

THE COURT: Are we back to the note now, or the mortgage?

MS. JENKINS: Excuse me, the mortgage. I apologize.

A I mean, just in different situations, it depends on the capacity and the form of the assignee of the mortgage as far as who acts on their behalf.

Q So it's not -- it's not necessarily uncommon to have different entities in their respective capacities to hold the loan documents?

A No.

MS. JENKINS: Your Honor, I understand defendant's argument. However, I don't know if you want me to --

if the Court would like me to present the case law I have.

THE COURT: Not until you rest and then we hear a motion, maybe. And we've had a pretty strong hint it's going to be renewed. And then we will deal with that and any other issues that might be part of their motion.

MS. JENKINS: All right. I just wanted to get an idea of the flow you prefer. Okay. So Mr. Fogleman, regarding the -- actually, before I introduce -- before I formally introduce the composite assignments of mortgage, I would like to approach counsel. And Your Honor, this is what is labeled "Asset Purchase Agreement" from Goshen Mortgage to Note Capital Group Ventures.

MS. MUELLER: I will object. This wasn't on their exhibit list, and I have never seen it before.

MS. JENKINS: That is correct. That's why I'm bringing it to the Court's attention. I did not have this in my possession until very recently. So I would like the opportunity to allow the defendant to testify to it. And as to the weight the Court assigns to it, I don't want to -- I still want to give the defendant -- excuse me, the plaintiff's witness an opportunity. Since the particular assignments are being challenged,

this is how I need to be able to address it.

THE COURT: How recently did you obtain possession of this document?

MS. JENKINS: Yesterday. Last night.

THE COURT: You want to take a look at it?

MS. MUELLER: I will look at it. But I'm not --

MS. JENKINS: I understand the Court still is within its discretion to give whatever weight, but I still needed to review it last night. So this is -- I'm not trying to in any way ambush opposing counsel. But if this is going to be -- in order to address this particular alleged inconsistency, this is a way to shed light on the parties and their representatives.

MS. MUELLER: I will look at it, but I keep my objection of allowing it into evidence, as it was never disclosed. I highly doubt this document just magically appeared out of the air. It either existed from a long time ago, or -- if it was just created specifically for today's purposes, then that's another story.

THE COURT: Right. Well, I don't know. It's about time for a break, anyway. So why don't you do that. Take a break, and we will be in recess until 10:30 by that clock. We will be in recess.

MS. JENKINS: Thank you, Your Honor.

(A recess was taken from 10:21 a.m. to 10:30 a.m.)

THE COURT: Counsel, have you had a chance to look over the newly-produced document?

MS. MUELLER: I have. I'm not sure that everything is included with it. I kind of saw something on the third page that referenced an Exhibit A, the mortgage file, as to what all the loan documents would be. I am assuming there is just a table of contents of those documents, and not the actual documents. So in that regard, I don't -- you know, I would rather see what the real contents are versus just what they are telling me they are.

THE COURT: Yes, but --

MS. MUELLER: I keep my objection with this not being on the exhibit list. I mean, if it presumably did come into existence in March of 2014, why wouldn't it be listed on an exhibit list?

MS. JENKINS: I can respond, Your Honor. I'm not saying it just came into existence last night. I advised the Court that I -- it came in my possession last night. I became aware of it last night.

THE COURT: Right.

MS. JENKINS: There were no misrepresentations made. It obviously existed before last night. I just got it last night, and I wasn't aware of it until last night.

THE COURT: Any explanation as to why a document that's created almost -- over two years ago and pertains to this case just showed up last night?

MS. JENKINS: Well, again, it existed. It just wasn't --

THE COURT: I mean, it showed up for you. I mean, your clients obviously knew that you were representing them, and the trial was going to be today. I mean, documents are supposed to be exchanged prior to the pretrial conference.

MS. JENKINS: I understand, Your Honor.

THE COURT: Much less the trial date.

MS. JENKINS: Without getting into any specific discussion, when I met with plaintiff's witness last night in anticipation of some of the arguments that are presented -- because I did have a chance to speak with opposing counsel a few times yesterday. So in those discussions, my discussions with plaintiff's witness, this was brought to my attention as a tool to further explain the relationships between the parties.

THE COURT: All right. Well, I appreciate that, and I was there. It's been a while ago, but I remember being a lawyer. And just when you think everything is prepared and ready to go and you've got everything you could probably need for a trial in terms of testimony

and evidence, you think of something else or something comes to your attention. And so you go out and obtain another document.

But that being said, it's just to me something that needs to be accounted for well prior to trial. And as we in this circuit -- and I think most of the circuits are consistent in having all parties, even prior to the pretrial, meet and go over their exhibits. And then I know you-all have been conversing face-to-face, and I think you said by e-mails as well.

MS. JENKINS: Yes, Your Honor.

THE COURT: So I think the objection is well-taken. Just for future reference, and I don't know if it would have mattered in this case, but something as late-breaking as this, if you're conversing by e-mails, even if you can't scan something in and send it as an attachment to an e-mail, at least whether it's -- whether -- I don't know whether you got it last night at 6:00 o'clock in the evening or midnight. But e-mail the other side and let them know that, "Hey, we got this. You're probably going to object, but we're going to try and get it in." You know what I mean? Rather than waiting until the morning of the trial.

MS. JENKINS: I certainly understand defendant's

concern for getting something at the last minute. And not to steer away from that particular issue, because I understand having -- getting something at the last minute in regard to -- just like defendant's argument regarding plaintiff's lack of response to the written request. That also is somewhat unduly burdensome to hear that on the day of trial when it's not -- at least based on my review, it wasn't in the pretrial -- the joint pretrial statement as to an issue that was going to be contested.

So in that same vein, I -- you know, we also had the document -- excuse me, plaintiff had in its possession the responses to the written requests, but those weren't admitted as documents. Those weren't included in the exhibit list, either, because we didn't realize that was going to be an issue.

So what I'm saying is, I understand, because I'm feeling the same stress from the argument regarding the plaintiff's alleged lack of response to the written requests -- excuse me, the request for verification of debt, when in fact we do have those documents. But we did not hand those over, because that wasn't going to be an issue, according to the joint pretrial stipulation.

THE COURT: Okay. Well, regarding this exhibit

that's at issue that's produced for the first time at trial, I'm going to sustain the objection. You might want to have it marked as an exhibit, which the clerk will be glad to do, but she will indicate that it was marked for identification only and not admitted.

(Plaintiff's Exhibit 3 was marked for identification.)

MS. JENKINS: May I approach?

THE COURT: You may.

MS. JENKINS: Your Honor, just for point of clarification, the composite -- plaintiff's composite exhibit regarding the assignments of mortgage, were those entered into evidence?

THE COURT: Not yet. You went over them. I don't think you've had them marked.

MS. JENKINS: I just wanted to make sure before I moved on to the next issue.

Q Okay. Mr. Fogleman, regarding the composite exhibit for the assignments of mortgage that you previously testified to, were those assignments made at or near the time of the acts described therein?

MS. MUELLER: I'm going to object. He wouldn't have personal knowledge of when the mortgage assignments were made.

THE COURT: I will sustain that.

Q In your capacity as -- in your capacity as general counsel for the servicer, what is the process for reviewing the assignments of mortgage in the boarding process?
A They are received in our records and entered into the servicing file by the boarding personnel.
Q And that review is subject to the same protocol, policies and procedures you have testified to earlier regarding the trustworthiness and the verification of those documents?
A Yes.
Q Okay. And are these particular records, assignments of mortgage, regularly kept in the course of business activity for SN Servicing Company?
A Yes.
Q Or Corporation, excuse me. And it's the regular practice of SN to make such records?
A Yes.
Q Okay. And based on your review of these particular assignments of mortgage, these assignments refer to the defendants, do they not?
A Yeah. These assignments are of the mortgage that was introduced earlier.
MS. JENKINS: Okay. Your Honor, plaintiff would like to submit a composite exhibit of the six assignments of mortgage into evidence.

MS. MUELLER: No objection.

THE COURT: So admitted as Plaintiff's Composite Exhibit 3.

MS. JENKINS: Yes, 3, because the purchase agreement was only marked for identification.

THE COURT: Right.

THE CLERK: No, it will be 4.

THE COURT: All right. So it will be Composite Exhibit 4. It's received in evidence without objection.

(Plaintiff's Exhibit 4 was received in evidence.)

MS. JENKINS: I am handing Mr. Fogleman a copy of the correspondence he testified to earlier. And I will give a copy to opposing counsel, regarding plaintiff's response to defendant's verification -- request for verification of debt for his review.

MS. MUELLER: I object to the extent I'm not sure what it is until I see it. I have to see it first.

MS. JENKINS: I'm going to give you a copy.

THE COURT: She is not seeking to introduce it yet. She is just having him identify it. So do you have copies for opposing counsel, or do you only have the one copy?

MS. JENKINS: I only have the one copy, but I will give it to opposing counsel.

THE COURT: And were these letters on the exhibit list?

MS. JENKINS: No, they weren't. But this is in response to defendant's unanticipated argument that's not on the pretrial stipulation about plaintiff's alleged failure to respond to the verification of debt. These are the actual responses to the verification of debt request.

MS. MUELLER: I will object to them not being on the exhibit list. And in the pretrial statement, we did list what the issues would be with regard to conditions precedent. It's my argument that these arguments all relate to the conditions precedent before bringing this lawsuit.

THE COURT: Well, that's true.

MS. MUELLER: Therefore, in anticipation, plaintiff could have listed them as exhibits.

THE COURT: Was the affirmative defense and the answer simply failure to comply with conditions precedent, or was that ever fleshed out?

MS. MUELLER: What do you mean by that? You mean what was my affirmative defense?

THE COURT: Yes. I mean, while the plaintiff can allege generically that it complied with all conditions and satisfied all conditions precedent, the defendant

can't generically say, "No, you didn't." If there is an issue with the conditions precedent, that the specific --

MS. MUELLER: There is. It's our eighth affirmative defense.

THE COURT: And it says what?

MS. MUELLER: That it's a violation of the federal Fair Debt Collection Practices Act and the Florida Consumer Practices Act, because it didn't have any right to enforce collection of the mortgage and note because it did not validate the debt as requested by the defendants.

THE COURT: Okay. So that would have put the plaintiff on notice, as the defense is required to do, to state with specificity what conditions precedent we're talking about. They identified that in the answer. And then, you know, they did the shorthand version in the pretrial stip.

MS. JENKINS: I also believe, Your Honor, that in some of our discussions yesterday, defense counsel advised of her intention to introduce the correspondence between the servicer, SN Servicing Corporation, and the defendant. This would -- it would be -- I can't say that they're exact copies, but for this type of correspondence, there would be no other

correspondence between the servicer and the defendants except for documents of this nature.

So I believe some of these documents are already included in defendant's exhibits as well. So they're not -- so some of them will be duplicate.

THE COURT: So have you seen these letters that she is talking about?

MS. MUELLER: No, I have not.

THE COURT: And if you look at them and you say, "Oh, yeah, these are part of our exhibits that were on our exhibit list," then obviously these will come in. But if these were not part of the defense exhibit of correspondence between the defendants and the plaintiffs, or the plaintiff's predecessors, then we will have to talk about it a little bit more.

MS. MUELLER: The first that's dated 2-8-16, I have never seen it, and the client has never seen it. This is dated February 10th, 2015. I have not seen this letter dated -- I haven't seen anything dated -- let me see.

THE COURT: Well, wait a minute. What are the dates of these things?

MS. MUELLER: Well, one of them is dated February 8, 2016.

THE COURT: That's after the case was filed. So

you can put that one down.

MS. MUELLER: This is February 10, 2015.

THE COURT: This is a 2014 case, so keep going.

MS. MUELLER: January 28, 2015. January 20, 2015. November 19, 2014. This case was filed June 19.

THE COURT: Right.

MS. MUELLER: This is 11-17-14. October 31, '14. October 15, '14. October 15, '14. October 15, '14.

THE COURT: Okay. So --

MS. MUELLER: They are all after the case was filed. They don't validate the debt after it was filed.

THE COURT: So since this is really post-filing, and I think really the legal issue -- did you give them back to her? Because I think she wants them marked as a composite exhibit. I'm going to let them in, because frankly the legal issue to me on this point is whether the request for verification of the debt can occur at the time the lawsuit is filed and subsequently to the lawsuit.

Because I'm gathering from the plaintiff that the plaintiff has no evidence that there was anything in writing regarding the verification of the debt request prior to the filing of the lawsuit. If there was, I guess you would have copies of that. So I'm

going to allow this in.

MS. MUELLER: I still object.

THE COURT: What?

MS. MUELLER: I still object.

THE COURT: I understand. But again, in terms of the legal point, I don't see that it has any impact, frankly.

MS. MUELLER: Okay.

THE COURT: So how do you want to mark this?

MS. JENKINS: As Plaintiff's Composite Exhibit Number 5. I believe we're on number 5 now. Yes, because the assignments of mortgage were Number 4.

MS. MUELLER: Then do we get copies? Those were the only copies.

THE COURT: I will require them at a break --

MS. JENKINS: I will make the copies, Your Honor.

THE COURT: But before I let them in, I do want to hear that -- while I'm sure your witness didn't personally mail them out, I want to hear something, because I think I'm just hearing -- not only has counsel for the defendant hasn't seen these letters, she was relating that her clients have never seen these post-filing letters, either.

So that's -- you know, so that, you know, I don't want to find out that these things, "Oh, yeah,

they were in our computer, and we were going to send them out, but we never sent them out." You know what I mean? "Because we had already filed a lawsuit." That's why they kept spitting them out every month, almost, it seems like. Right?

MS. JENKINS: We will go through them, Your Honor.

THE COURT: You don't have to go through each one. But ask him if he knows about any of these that he knows were sent out because he knows -- they were sent out certified, and we got the return receipt, or it's his company's business practice to send these things out even after the lawsuit was filed.

MS. JENKINS: Yes, Your Honor. I will ask the witness.

THE WITNESS: Can I have just a minute to put them in order? Then I can respond to what you're asking.

THE COURT: Yes. Put them in chronological order, if you don't mind.

THE WITNESS: I assume you want to do that to show the dates.

THE COURT: Yes. Correct. Thanks.

(pause)

THE COURT: And ultimately this composite exhibit will be Plaintiff's Composite Exhibit 5.

MS. JENKINS: Yes.

Q Mr. Fogleman, we've marked the -- a series of correspondence from SN Servicing Corporation to the defendants as Plaintiff's Composite Exhibit Number 5. And you're reviewing that at this time; correct?

A Yes.

Q Can you, before we get into some of the -- before we briefly get into some of the individual correspondence, can you describe the nature of the correspondence?

A Well, the correspondence that was written by myself and sent out is correspondence in response to letters received from the borrowers after the lawsuit was filed. There is also correspondence received and sent from our office concerning insurance coverage for the property that was sent out by the insurance department for our company.

Q So in that -- in that composite exhibit, it includes letters from the borrowers, requesting information --

A I didn't include their copies. I assumed they had them. I have copies of their letters they sent to our company, but I can include those, if you need.

Q Let's -- let's describe the -- the letters that you sent out. Let's testify about the letters you sent out to the borrowers.

A Okay.

Q And in doing so, you can describe that it was in

response to such-and-such correspondence.

A Okay. As a part of my duties as general counsel for the company, I'm required to send out written responses to qualified written requests. They would either be sent pursuant to RESPA or Fair Debt Credit Practices Act. In that matter, I mean, I received letters from the borrowers after the foreclosure was filed, asserting that the loan was not valid, and that they did not understand why we were seeking to pursue a foreclosure in this matter.

In response to those letters sent, I sent letters back to the address, addressed to Wayne Masson at the address of the property on October -- and I personally can testify that the letters were sent. I signed them and sent them myself on October 31, November 19, January 20, January 28, and February 10.

THE COURT: Regular mail?

THE WITNESS: Yes. Some were sent certified. But if they -- if -- a couple of them came back, and we re-sent them regular mail. Sometimes a borrower will not accept certified mail, so they are sent back. My practice and what I do is I re-send them by regular mail.

THE COURT: To the Sugarloaf Key address?

THE WITNESS: 17213 Sugarloaf Lane E, Sugarloaf Key, Florida. And that is my practice, and I can

testify that's what was done.

MS. MUELLER: I will just object on sending anything certified mail, unless they have proof.

THE WITNESS: There is no requirement the letters be sent certified mail.

THE COURT: I will overrule that, because he said he didn't assign this to somebody in California. He said he did this himself, or ordered it to be done. Whether they actually received it, he is saying he doesn't know specifically whether they got any of them. So I will overrule your objection.

MS. JENKINS: The plaintiff will definitely rely on the mailbox rule.

THE COURT: I'm not sure, do we really want to spend a lot of time on this post-filing business?

MS. MUELLER: I don't, no.

THE COURT: Because isn't it your argument that your clients requested this to be done before the lawsuit was filed, and then the next thing you know, they got this lawsuit?

MS. MUELLER: Right.

MS. JENKINS: I understand, Your Honor.

THE COURT: I'll allow these exhibits in evidence, for whatever value they might have.

MS. JENKINS: Thank you, Your Honor. I appreciate

it. The plaintiff just wanted to respond to the defendant's allegation that they never received anything, when in fact these were in response to letters that they in fact sent to the plaintiff. And that's why it was a series of letters. And according to the mailbox rule, he doesn't have to prove that they received them. Just that he -- he can testify as to whether he mailed them.

THE COURT: As I understand, and we can go back and forth on this, this post-filing correspondence is a non-issue.

MS. JENKINS: Yes, Your Honor. We will move forward.

THE COURT: So do you have those? We will have the clerk mark them in as Plaintiff's Exhibit 5.

(Plaintiff's Exhibit 5 was received in evidence.)

THE COURT: I just want to know how much further the plaintiff needs to go. Is there an issue in this case about the defendants at some point not paying on the note?

MS. MUELLER: Not to my knowledge. What do you mean?

THE COURT: I thought that was going to be one of our factual issues. And I got the impression that, "Well, yeah, the defendants quit paying at some point."

So that's not --

MS. MUELLER: That would be their burden.

THE COURT: Okay. I'm just trying to see if that's going to be contested by the defense.

MS. MUELLER: No.

THE COURT: Because they say, "We quit paying." And you say, "Oh, we pay every month." See what I mean? I'm trying to see what it's going to be at the end of the day. It sounds like we're going to focus on the standing/assignment issue, and the conditions precedent issue.

MS. MUELLER: Yes.

THE COURT: Okay. So if you can kind of get going on --

MS. JENKINS: I understand, Your Honor. So just to be clear. The default is not going to be contested, whether the defendants defaulted on the note.

THE COURT: No, but I think there needs to be something in the record on that.

MS. JENKINS: Oh, definitely. I just didn't want to go through a whole line of questioning if they -- I mean, I will establish it.

THE COURT: You can do the short version.

MS. JENKINS: All right.

Q Mr. Fogleman, this note and mortgage were executed

on which date?

A April 15, 2005.

Q And did -- based on your review of the subject loan documents, how did this matter end up being referred to South Milhausen to file a foreclosure action?

A The borrowers defaulted on the payment due November 1, 2010, and have not made a payment since.

Q And that would include any full or partial payments; correct?

A Correct.

Q As a result of that default, which remedy are you seeking -- is the plaintiff seeking?

A Foreclosure of the property due as security for the debt.

Q And that would also include acceleration of the note as well; correct?

A Yes.

Q And what is the amount of the unpaid principal balance due?

MS. MUELLER: I'm objecting, unless they lay a foundation. What are we looking at with the amount, this number?

THE COURT: I will sustain that until there is --

MS. JENKINS: Okay. I will back up, Your Honor.

Q You testified that the note and mortgage were

executed on April 15, 2005. And what amount was the note for?

A $670,000.

Q Even?

A Yes.

Q And what is the amount of the unpaid principal balance that's outstanding?

A $659,029.22.

Q Say it again, please.

A $659,029.22.

MS. MUELLER: Same objection. Lack of foundation. There is nothing that's been put into the record that would let anybody else see where that number came from.

MS. JENKINS: I'm referring to the loan history, which Counsel has seen, but we agreed that I would enlarge the copy for better visibility. So this is the enlarged copy, if I may.

MS. MUELLER: Thank you.

MS. JENKINS: Your Honor, would the Court like to see an enlarged copy?

THE COURT: Not yet.

Q Mr. Fogleman, can you describe for the Court the document titled SN Servicing Corporation Loan History General?

A This is the loan history of the loan that was

boarded by SN Servicing with the history of any payments that may have been received and any charges that were made against the loan.

Q And does it reflect the last missed payment or the default -- the date of default?

A Yes. It shows the due date of the next payment due was November 1, 2010.

Q And this would be -- just for the Court's edification, this would be on the first page of this document or this ledger, if you will?

A Correct.

MS. MUELLER: I'm actually going to object on the basis that with regard to the foundation being laid, there are no other prior servicer records included, and SN Servicing has not been the only loan servicer. And there has been no foundation as to how any of the prior amounts got entered into SN's -- on to a document with SN's letterhead only on it.

MS. JENKINS: Your Honor, plaintiff was just going through one document at a time. There are several -- there are a series of documents. But for the purposes -- since this is a ledger, the witness had testified to one document at a time, and the first one being the SN Servicing Corporation document.

We also have the -- and defense counsel also

has a copy of another ledger, a report, if you will, from the previous servicer. But since -- given the nature of it, I just wanted to do one at a time.

THE COURT: That's fine. So this -- I think the witness says these are the SN business records?

THE WITNESS: Yes, Your Honor.

THE COURT: Of which you are a records custodian; is that correct?

THE WITNESS: Yes, Your Honor.

THE COURT: So this will be Plaintiff's Exhibit 6, I think.

THE CLERK: Yes.

THE COURT: So as to the SN --

MS. MUELLER: Well, if he is testifying that they input this entire -- I don't know if that's what he is testifying to, that they input the entire loan history. I mean, I don't know how it works. I haven't heard any of that testimony.

THE COURT: So does this exhibit exclusively cover the period when SN was servicing the loan? Is that correct?

THE WITNESS: Yes, Your Honor.

THE COURT: All right. I will allow this in as Plaintiff's Exhibit 6.

(Plaintiff's Exhibit 6 was received in evidence.)

Q Okay. So Mr. Fogleman, during your course of -- during -- excuse me, during your review of this particular ledger, is this an accurate representation of the facts stated therein?

A Yes.

MS. MUELLER: I object to the extent that he is the individual that enters any of this information into the system.

THE COURT: Again, the records custodian doesn't have to be the individual who inputted the information. So I will overrule the objection. I have allowed this in as Exhibit 6.

MS. JENKINS: All right. So I will move on.

THE COURT: If you want to get the bailiff to take that up to the clerk, can you help them do that?

MS. JENKINS: Thank you.

THE COURT: While she is going on to the next one.

MS. JENKINS: The next document would be a document titled FCI Lender Services, Inc. And this is the one we discussed yesterday with the tiny font. There is a title called Loan Master Report as well. There is an FCI logo to the upper left-hand side. Yes, that's it.

Q Could you please describe to the Court the document that you are looking at?

A This is the loan report from FCI Lender Services, Inc., which was the servicer prior to SN Servicing Corporation, with their loan history, their summary of the loan history for this loan from the date of default, October of 2010 to the time that the loan was transferred to SN Servicing for servicing.

Q Now, is this document one of the documents considered in the boarding process you described -- excuse me, you testified to earlier?

A Yes.

Q So this Loan Master Report would have also been considered by SN Servicing Corporation as to the trustworthiness and verification of the amount set forth therein?

MS. MUELLER: And I object to his personal knowledge of another loan servicer's boarding process and/or whether or not their documents are trustworthy, without any other foundation being laid.

MS. JENKINS: He is actually testifying to his servicer's -- excuse me, his company's boarding process as to what they do to verify the verification of documents they're receiving from other -- from previous predecessors.

THE COURT: Okay. So we will let him talk about that. So go ahead.

Q And in your -- in the SN Servicing Corporation's review and verification process of predecessor servicers, can you describe to the Court how that works?

A I mean, typically there is very often a transfer of servicing from one servicer to another. So when we receive a loan that's been serviced by a prior servicer, we also receive either a printout or a summary of their servicing records, indicating the principal balance due, escrow advances that were made, any -- any -- anything that would be charged as a corporate advance, such as legal fees or other costs that were advanced to the amount of the loan, and the date of the last payment.

That information is then reviewed by our boarding department. It's entered into our system, and it becomes a part of our records for servicing the loan.

Q Now, this process you describe, this boarding process, is there a detailed -- a checklist or point analysis that's done, for lack of a better term, that SN Servicing Corporation goes through when verifying a previous servicer's records?

A Yes. I mean, we go through and check. We try to -- as far as verifying the status of the loan, in this case actually we were able to verify it also by the fact that at the time servicing was transferred, there was a complaint already filed of record which had a verification

in the amount that was due.

And in addition, there was a review of the advances that were -- had been made by the prior servicer. And in that instance, you know, we typically check those. And in this instance, actually those -- the corporate advances were waived off because we felt the legal fees were not allowed since it was already in an active foreclosure.

Q So there is a mechanism or vehicle, if you will, to communicate with the prior servicer or make decisions regarding the ability to waive certain fees for your servicing company?

A Yes.

Q Okay. And that would be after the debt has been verified based on your -- the policies and procedures you've described thus far?

A Yeah. Actually we've used more than one method in this case. We used the prior servicer's records. We also had in this case a verified complaint that had been filed part of the time servicing had been transferred. In addition to that, of course for verification with the borrower we send out a letter, which is required by RESPA. I mean, everybody does it, which has the amounts in it for verification with the borrower.

MS. MUELLER: I will object to any discussion of verification of the debt of his personal knowledge of

doing the same prior to the filing of the lawsuit.

THE COURT: I will sustain that objection, unless there is some kind of letters produced.

Q And you testified that no payments have been made since the -- this matter has been transferred to SN Servicing Corporation?

A That's correct.

Q And the amounts purportedly due do not include late fees; correct?

A Correct.

MS. JENKINS: I believe this is -- oh, excuse me, this is the second half. So plaintiff would like to submit this particular Loan Master Report, if you will, from the previous -- from the predecessor servicer as Plaintiff's Exhibit 7, I believe.

MS. MUELLER: And I would like to reserve an objection on the record. This is not the only prior loan servicer of the loan. There are at least two other loan servicers that serviced.

THE COURT: Okay.

MS. MUELLER: This document for FCI begins September 18 of 2013. So it doesn't have any of the amounts from the alleged date of default up and through that date. So it's my opinion they haven't proved the amounts due without any other support from any other

loan servicer.

THE COURT: Maybe not. But I think they've established the predicate for allowing this exhibit in evidence. So I will overrule the objection and allow this exhibit in as Plaintiff's Exhibit 7. Do you want to bring it up here so we can get it marked?

MS. JENKINS: Thank you.

(Plaintiff's Exhibit 7 was received in evidence.)

MS. JENKINS: One moment, Your Honor.

THE COURT: Sure.

(pause)

MS. JENKINS: I'm handing Mr. Fogleman a copy of the April 24, 2014 demand letters to both defendants, separate letters. Opposing counsel does have a copy of these.

MS. MUELLER: I do.

MS. JENKINS: It's two separate letters.

THE COURT: Any question on these demand letters?

MS. MUELLER: No.

THE COURT: Can they come in?

MS. MUELLER: I assume they are the same demand letters that are included in the trial exhibits that were furnished to me.

MS. JENKINS: Yes.

THE COURT: All right. Any problem with these

coming in?

MS. MUELLER: No.

THE COURT: All right. You want to have them marked as Plaintiff's Composite Exhibit 8? They will be admitted into evidence.

MS. JENKINS: Thank you.

(Plaintiff's Exhibit 8 was received in evidence.)

MS. JENKINS: Your Honor, as it refers -- I mean, regarding damages, I would like to refer the Court to its June 12, 2015 order on plaintiff's motion for summary judgment. This is an order that's obviously in the record. I just wanted to point out, this is -- let me back up. June 12, 2015. And I do have copies. I just wanted to point out that the Court ruled that there was no issue of material fact as to damages.

THE COURT: Yeah, I saw that.

MS. MUELLER: If I may just point something out on those exhibits that were just admitted, they are actually the wrong address. I just noticed that. They don't have the complete street address of the property. It's missing a number, actually. It has listed as 1721 Starfish Lane East. But the address is 17213 Starfish Lane East.

THE COURT: Yeah, I saw that was what was described on the mortgage and the note. Okay. It has

what it has, and it doesn't have what it doesn't have.

MS. JENKINS: Exactly, Your Honor.

THE COURT: But I'm not dismissing that. That might be a big deal. That's why when this order went out, it looked like Judge Evans signed it on June 12 of 2015, he put in there that there was no issue of material fact as to damages. That's why I was wondering why we were spending any time on the damages issue.

MS. JENKINS: That's why I was asking.

THE COURT: But we did, and so it's accounted for.

MS. JENKINS: I didn't want to waste the Court's time if it wasn't contested.

THE COURT: We're good. It probably should be here, anyway, with the specifics on it. So that's fine.

MS. JENKINS: Excuse me, Your Honor.

THE COURT: Sure.

(pause)

MS. JENKINS: Thank you, Your Honor. I appreciate your accommodations.

THE COURT: Sure. Anything else from the plaintiff?

MS. JENKINS: Actually, there is no more presentation of evidence from the plaintiff. However,

I would like to make an ore tenus motion for the Court's consideration.

THE COURT: Before cross? You can. I'm just saying, do you want to, or -- you know, do you need to have it ruled on before there is cross, or maybe there won't be cross. Maybe they will rest, and you can make a motion. That will be up to them.

MS. JENKINS: I will do it before cross, okay? In the interest of judicial economy -- and obviously the Court may grant or deny. But considering the fact that the assignment -- considering the challenges to the assignment issues, plaintiff would like to move for leave to amend the complaint. And I know that we're obviously in trial now. However, there is case law regarding parties or even defendants amending affirmative defenses, or parties --

THE COURT: Yes. We let parties move to amend the pleadings to conform with the evidence, for example. Or sometimes it's just a straight amendment. Usually it's of a clerical nature when a name is misspelled. But sometimes it's a substantive amendment, which makes it a more difficult issue to deal with in the midst of trial. But go ahead. Let's hear the proposed amendment.

MS. JENKINS: That's correct. And I recognize the

challenge. However, I just wanted to bring it up now, instead of waiting, going forward to the end, and bringing it up then. The proposed leave to amend would be to add a reformation of assignment count to address, if the Court finds it to be an issue, the challenges to the assignments of mortgage, if the Court decides not to give any weight to the defendant's testimony -- excuse me, the plaintiff's representative's testimony as to the agencies and the trustees acting on behalf of different servicers.

So as I sit here right now, the motion for leave to amend would be to add a reformation of assignment of mortgage.

THE COURT: But specifically which assignment? Because we have six of them.

MS. JENKINS: Okay. It would be the --

THE COURT: I think I pulled up the ones you're probably going to talk about.

MS. JENKINS: Yes. It would be the assignment from the fifth and the sixth. The fifth to the sixth assignment. And that would be from Goshen Mortgage, LLC, to -- I don't want to say the acronym out of order.

THE COURT: It's GDBT-1 Trust 2011.

MS. JENKINS: Yes. That subsequent assignment,

Goshen Mortgage, LLC, to the plaintiff. So that series.

THE COURT: What is it exactly you would want to reform? What specifically, how you want it reformed? One of them, or both of them?

MS. JENKINS: Well, because the GDBT, it's not necessarily -- it's not necessarily specified as being a nominee or trustee on behalf of Goshen Mortgage, LLC. And I have seen it many times, not necessarily that particular party. But I have seen in many cases where you have different trustees and in-house servicers that are included in the chain of -- excuse me, the transfers or the assignments.

So to correct that -- well, I don't want to say "correct". But to reform that segment of the series.

THE COURT: To say what or to show what?

MS. JENKINS: Well, to show -- because right now it looks like it presents -- it arguably presents a conflict, or it arguably looks like --

THE COURT: It doesn't "arguably." It leaps off the page.

MS. JENKINS: Okay. Well, right now --

THE COURT: It's an express knowledge.

MS. JENKINS: Right now there is an assignment to

two different entities at two different times.

THE COURT: Yes. Correct.

MS. JENKINS: However, it's my understanding that that first entity, GDBT, is someone -- is a trustee or an agent or a subsidiary of Goshen Mortgage, LLC. So without being the -- without being the representative -- without being the records custodian of Goshen Mortgage, LLC, I would like that to be reformed so that it's correct. Now, what the correction will be, I'm not exactly sure. But I do know in my experience --

THE COURT: That's what I mean. Because I heard testimony from Mr. Fogleman that in general sometimes what purports to be an assignee is simply a holder or a trustee or a nominee. But I'm not sure I heard anything specific about this case.

MS. JENKINS: I would like the opportunity --

THE COURT: I'm not really sure he would know. But that being said --

MS. JENKINS: I would like the opportunity to get the -- to give the plaintiff the opportunity to clarify that.

THE COURT: When? And with whom? And how?

MS. JENKINS: With the corporate representatives.

THE COURT: Of?

MS. JENKINS: Of GDBT, of Goshen Mortgage, LLC, and --

THE COURT: I'm not sure what you're asking me to do. Are you asking me to indefinitely recess this trial so that (a), you can amend your pleadings, which I guess would be in writing, and then -- so how are we going to do this procedurally?

MS. JENKINS: If there was a leave -- if there was a leave to amend the complaint to add the reformation count -- because technically it would be a reformation count. If -- it depends on if the Court wants us to go that formal route.

THE COURT: Let's go through this, because it's your -- I think the lightbulb has gone out. And you know --

MS. JENKINS: There is different ways of doing it.

THE COURT: There is different ways of getting it. But if it was in mid-trial -- and I have had this happen. "Judge, you know, we've got everything we need here to cover this. It's not an explicit issue. It's one that everybody knows about. We're ready to deal with this now. We don't need to recess everything. We will just have a witness or witnesses that we've already got to cover it, and the other side knows all about it. And the witnesses have been deposed on this

issue. It's just not formally in the pleadings." That's fairly easy to deal with, and you can probably guess how I would rule on something like that.

But with this, when we're talking about not only amending the pleadings, but I guess recessing this trial until people are identified -- and I think I know what the defense is going to say, but I think they need to say it. Go ahead.

MS. MUELLER: I totally object. They have had over two years.

THE COURT: I know.

MS. MUELLER: This was the subject of a motion to dismiss, even. It's not like it just happened yesterday. It happened when they filed the complaint. They should have handled it then. It's ridiculous to ask for it now.

THE COURT: And I don't know, have you been involved with this case the whole time?

MS. JENKINS: No, Your Honor.

THE COURT: So I mean, that's another problem in some cases. And it's the nature of the beast. Lawyers come and go. But anyway, there are different ways --

MS. JENKINS: I was suggesting a more formal way. I know that there are different ways. I just didn't want -- it's obviously up to the Court's discretion if

you would even rule in the plaintiff's favor on that. But I know that there are different ways. It's just --

MS. MUELLER: And not only that, but remember, we have requests for admissions that were deemed admitted. And in those requests, it specifically says the mortgage was not assigned to plaintiff from the last known entity. Two different mortgage assignments from Goshen to two different entities, one of which is plaintiff. There is no clear chain. This is not anything new. They had many opportunities to do this. To do it now is not acceptable in my opinion.

THE COURT: Right. And so when did those go out?

MS. MUELLER: Which ones?

THE COURT: Your request for admissions.

MS. MUELLER: These went out in March of 2015.

THE COURT: Right.

MS. JENKINS: Your Honor, plaintiff has filed -- like we were briefly discussing earlier regarding whether we were going to present the case law or not. Plaintiff did file an amended -- or a proposed response to the admissions. However, as you know, the Court ruled -- denied the motion for relief from the technical admissions.

THE COURT: And on that one, which one was that? Which request, which numbered request for admission was

that regarding the --

MS. MUELLER: It's Number 4 and Number 5.

THE COURT: What was the proposed response on 4 and 5? Maybe you have it.

MS. MUELLER: I've got to find it.

THE COURT: I assumed it said, "Denied."

MS. MUELLER: Probably. I don't remember, but I would assume the same. But obviously the evidence does not contradict that. So any case law we talk about --

THE COURT: I know.

MS. JENKINS: The case law does refer to the party's ability to have the case tried on its merits.

THE COURT: I know. What is the -- what was the proposed response on the Request for Admissions 4 and 5?

MS. JENKINS: Four is denied. Five, and I'm reading verbatim, "Objection to the extent that the request is compound in nature and calls for a legal conclusion. Without waiving said objection, plaintiff denies that there is not clear chain of title."

THE COURT: Okay. So assuming that I let the plaintiff out of what's been called a technical request for admissions, and I also -- I withdrew the June 11, 2015 order that held those so-called technical admissions in place. I'm hearing now -- and that was

June of 2015, more than 11 months ago.

What I'm hearing now from the plaintiff is that at our trial today, even though the plaintiff wants out of those admissions, the plaintiff is not ready to deal or present evidence to discuss the discrepancy between these two assignments from Goshen to two different entities. I think that's what you're telling me.

MS. JENKINS: Well, the plaintiff has discussed it to the extent possible, and has provided testimony to the extent possible.

THE COURT: Okay. Which again, as I heard it, didn't specifically address this scenario with Goshen Mortgage and GDBT-1 Trust 2011-1.

MS. JENKINS: Yes, Your Honor. My concern is, given that in Response Number 5 plaintiff denies that it's not a clear chain of title, that there may be some ambiguity as to -- based on my experience with these assignments of mortgage, there may be some ambiguity as to the description of GDBT, that entity, whether it's a trustee or whether it's -- I would just like the opportunity for plaintiff to clarify that, despite this late hour.

THE COURT: And why should it be given the full disclosure of this being an issue and the passage of

almost -- over a year when this first was raised? And I know you're kind of just coming into this thing, and we're here at trial now to address all issues that were on the table, and this is clearly one.

Before I make a final ruling on the ore tenus motion to amend, let me ask the defense, do you want to conduct cross-examination, or do you want to not have any so that the plaintiff can rest and then you can make a motion?

MS. MUELLER: I would like to cross-examine the witness. Well, can I just say one thing about GDBT, the nature of it? It's not a trustee. It's a Delaware statutory trust, just for the record.

THE COURT: Well, it's for the record. And I appreciate you giving me some information that's not evidence, but --

MS. MUELLER: Well, actually, I will let you make your ruling on the ore tenus motion, and then let the plaintiff rest.

THE COURT: All right. So I will deny the motion to amend. And so no cross?

MS. MUELLER: I'm going to move for an involuntary dismissal.

THE COURT: Let's see. They haven't formally rested yet. So does the plaintiff rest?

MS. JENKINS: Plaintiff rests.

MS. MUELLER: I move for involuntary dismissal.

THE COURT: Based on?

MS. MUELLER: The fact that they cannot establish standing. They did not receive the note -- or the note from the last known entity. And that mortgage assignment from Goshen to GDBT was for value, meaning that they are saying that they sold it to GDBT. They cannot later turn around and sell it again to Note Capital.

THE COURT: I mean, did anybody get any phone calls?

MS. JENKINS: If we could take a brief recess, I would appreciate it, Your Honor.

THE COURT: Well, we're going to take a lunch recess. We will come back. And if it were me in your shoes, I wouldn't be waiting for a phone call. I would be dialing whatever numbers I could dial.

MS. JENKINS: I have a few phone calls to make.

THE COURT: Multiple dialings. Automatic, continuous speed dialing to get somebody to tell them about the urgency of the situation. Because as I understand the status of the law, if I were to grant your motion -- and that's assuming we even got to that point, because they have the right to do something

that they can do before a judge in a non-jury trial renders a decision, which we all know the plaintiff can do.

But even if I grant your motion and the case is involuntarily dismissed, as I understand it, at least from the Third District by virtue of the Beauvais decision -- have you read that?

MS. MUELLER: I have. And it has to be a subsequent default. This is the second foreclosure with the same default date that, oh, by the way, is now five years gone.

THE COURT: Maybe if we get to the point of me granting your motion, they will send out a subsequent default letter. But see what I mean? Just because somebody might win in this case won't mean that the thing is over. So that's why, if there is a deal that could work --

MS. MUELLER: I agree.

THE COURT: -- for everybody, I want -- I don't want to break that up and make a ruling before we hear. So we're going to break for lunch. I'm going to take the defendant's motion for involuntary dismissal under advisement. And then if you-all hear something, let us know. And if it's, "Oh, we've got a deal, Judge, we don't need to come back," or if you want to come back

at 1:00 and tell me what happened, that's fine, too. And you know, if you have -- you just need to get a decision.

MS. JENKINS: I understand, Your Honor. What time are we returning?

THE COURT: Well, let's say 1:15, to give you a little more time.

MS. JENKINS: Thank you, Your Honor.

THE COURT: All right. We will be in recess.

(A lunch recess was taken from 11:42 a.m. to 1:18 p.m.)

THE COURT: We are reconvening our case of Note Capital versus Masson. And we had recessed for lunch, and the plaintiff and the plaintiff's representative and counsel were going to see if they could communicate with somebody out in California.

MS. JENKINS: Yes, Your Honor. And actually he is on the phone as we speak. So I stuck my head in and let him know that it was 1:15.

THE COURT: We don't want to terminate any significant phone calls.

MS. JENKINS: Exactly. He is still talking. But I just wanted to let him know that I would be in here.

THE COURT: Okay. So I tell you what, I mean, there is no --

MS. MUELLER: I just have a matter of housekeeping. From our pretrial, you actually granted my motion to enforce the motion to compel discovery dated May 5. And this was as to one of the third party defendants. I have a proposed order.

THE COURT: Don't you represent all the third party defendants, too, or at least the ones that are still around?

MS. JENKINS: Yes, the ones that are still in existence.

THE COURT: Why don't you review that, and we will take a little time with that. And we will wait for the phone call to go one way or the other. And just, if you will let the bailiff know, and he will come and get me.

MS. JENKINS: I have plaintiff's proposed orders as well, which may be moot, depending on the result and the phone call.

THE COURT: So maybe you will -- if you want to give those to her as well, just in case. We've got a little time. So just, like I said, let the bailiff know, and I will be back.

MS. JENKINS: Thank you, Your Honor.

THE COURT: We will see what happens.

(A recess was taken from 1:20 p.m. to 2:25 p.m.)

THE COURT: All right. Reconvening in Note Capital v. Masson. What do we have to report?

MS. JENKINS: Yes, Your Honor. I'm not sure which order. This is obviously not testimony, but I would like to report the update.

THE COURT: Okay. Good.

MS. JENKINS: Okay. So I actually spoke to the investors myself. And obviously this is not evidence or testimony. But I spoke to them, and apparently the questionable assignment of mortgage from Goshen to GDBT, it appears that it was likely prepared in anticipation of a closing that never materialized. So the position is that it's erroneous.

And I did not have -- again, I'm not presenting this for evidence. But I did not have this information before when I asked the Court for leave to amend to address the reformation of the assignments. And I wasn't going to misrepresent to the Court, because I didn't have that information.

So now it's upon my information and belief that the subject -- the fifth assignment was likely prepared in anticipation of a closing, because sometimes you have different buyers reviewing the portfolio at the same time. That closing probably never materialized. And that's why it was -- that's

why that document exists, but should not have been in the file. It should not have made it this far.

So again, I'm not attempting to present evidence. I'm just responding to the Court's request for more detailed information as to -- in support of plaintiff's motion for additional time to address the erroneous -- what I know now to be the -- what I believe now to be the erroneous assignment of mortgage that is at issue. But for that assignment of mortgage, the chain -- the chain of assignments would be complete.

THE COURT: Okay. Am I taking this by you discussing what you just discussed that the call made to California relating to potential settlement of the case did not result in a settlement?

MS. JENKINS: You are correct. There was extensive conversation over the lunch period, and the call did not result in settlement.

THE COURT: Okay. All right. Well, then, that takes us back to where we were before lunch. I have denied the plaintiff's ore tenus motion to amend the pleadings to add a count for reformation of an assignment. But now I am assuming, based on what you just told me, you would not -- you would not be making that motion. You would just be -- I don't know what

you would be doing, because you don't want to reform anything. You just want to have us ignore the assignments that the plaintiff introduced -- that assignment that was introduced into evidence. So anyway, I denied the ore tenus motion to amend. And I have taken the motion for involuntary --

MS. JENKINS: We would like to dismiss voluntarily, Your Honor.

THE COURT: Okay.

MS. JENKINS: Since you denied my renewed motion to -- that's correct; right? You did deny my motion to --

THE COURT: All right. So on the record, the plaintiff has announced a voluntary dismissal of the case.

MS. JENKINS: Wait. Just to be clear, I apologize, just for clarity. Did the Court deny my motion, the plaintiff's motion to correct the assignment -- the erroneous assignment of mortgage?

THE COURT: Okay. Well, that's the first time I'm hearing you making a motion. When you started telling us about what you learned in a call to California during the break, I didn't -- I thought it was just you were telling me. I didn't hear that there was a motion.

MS. JENKINS: I apologize, Your Honor. It's been a very exciting afternoon.

THE COURT: So what's the motion?

MS. JENKINS: For the record, plaintiff, given the new information that I've been provided over the break, given the plaintiff's belief that the subject assignment of mortgage from Goshen Mortgage, LLC, to GDBT was in fact erroneous, plaintiff would ask the Court for either a continuance, or leave to amend to remove this erroneous assignment of mortgage that should not be in the file.

THE COURT: All right. I'm going to deny the motion.

MS. JENKINS: You're denying the motion for continuance as well?

THE COURT: Correct.

MS. JENKINS: Just to be clear.

THE COURT: Correct.

MS. JENKINS: Okay. In that event, the plaintiff seeks a voluntary dismissal.

THE COURT: By rule, you don't -- you don't seek it. You just announce it, which I think you are. And the Court --

MS. JENKINS: Yes.

THE COURT: And the Court, having not ruled with

finality on either a verdict in the case or a dispositive motion, acknowledges the announcement of the voluntary dismissal. And I will see what happens, if anything.

MS. JENKINS: Thank you.

THE COURT: Thank you.

MS. MUELLER: We still have the third -- this is on the third party complaint. This was the order compelling the discovery. May I approach?

THE COURT: You may.

MS. MUELLER: She has reviewed it, I believe.

THE COURT: That was okay?

MS. JENKINS: Yes. Thank you.

MS. MUELLER: There are three copies.

THE COURT: So we're not adjourned. We're rolling into a semi-case management on the third party complaint. Was the answer filed?

MS. MUELLER: He filed a motion to dismiss.

THE COURT: Oh, okay. So obviously we're not at issue yet. So at some point that will be set.

MS. MUELLER: Correct.

THE COURT: Just to let you all know, I will be back here in late June. We have some hearing time in those last four or five days in June, four days in June, of this coming month.

MS. MUELLER: Our office is actually going to have a notice of unavailability for the entire month of June. So we will figure that out when we can.

THE COURT: Okay. And really that motion, I don't have to hear it. I was just saying, it could be heard by me or some other judge.

MS. MUELLER: Okay.

THE COURT: It doesn't matter. And then you-all are proceeding with whatever -- did you say you had some additional discovery to do on the third party complaint?

MS. MUELLER: Yes. We will, yes.

THE COURT: Okay. So you will move forward on that.

MS. JENKINS: Yes. The third party defendant was provided an additional 30 days to provide the documents or to confirm their non-existence.

THE COURT: Okay. Well, I have signed this order. So I think you have my conforming stamp; right?

THE CLERK: No, I don't have it.

THE COURT: If you want to wait a couple of minutes, we will get my conforming stamp, and you can take the copies with you.

MS. MUELLER: Sure. Thank you.

THE COURT: Well done by both sides. We will be

adjourned.

MS. JENKINS: Thank you, Your Honor.

(The proceedings concluded at 2:33 p.m.)

CERTIFICATE OF REPORTER

I, Amy Landry, Registered Professional Reporter and Florida Professional Reporter, do HEREBY CERTIFY that I was authorized to and did report the foregoing proceedings; and that the transcript, pages 1 through 100, is a true and correct record of my stenographic notes.

Dated this 6th day of June, 2016, at Key West, Monroe County, Florida.

Amy Landry

Amy Landry, RPR, FPR
All Keys Reporting,
a U.S. Legal Support Company
9701 Overseas Highway
Marathon, Florida 33050

**$**

**$659,029.22** 69:8,10
**$670,000** 69:3

**(**

**(a)** 84:5

**1**

**1** 33:2,3 34:11,13,20, 22 68:7 70:7
**10** 60:2 64:15
**10:21** 49:25
**10:30** 49:23, 25
**10th** 59:18
**11** 87:23 88:1
**11-17-14** 60:7
**11:42** 92:10
**12** 78:10,13 79:5
**14** 60:7,8
**15** 28:7 60:8 68:2 69:1
**1721** 78:22
**17213** 64:24 78:22
**18** 76:22
**19** 60:5 64:14
**1:00** 92:1
**1:15** 92:6,19
**1:18** 92:11
**1:20** 93:25

**2**

**2** 33:4 34:12, 13,21,22
**2-8-16** 59:16
**20** 5:8 42:24 60:4 64:14
**2005** 28:7 31:14,25 68:2 69:1
**2010** 68:7 70:7 73:5
**2011** 35:12 36:15,19,21 37:15 38:6 40:3 42:21 81:24
**2011-1** 43:18 88:14
**2012** 42:24
**2013** 44:3,8 45:5 46:3,4 76:22
**2014** 44:15 46:9 50:15 60:3,5 77:13
**2015** 27:16, 18,22,23 59:18 60:2,4 78:10,13 79:6 86:15 87:24 88:1
**2016** 59:24
**22** 42:21
**24** 77:13
**28** 44:15 46:9 60:4 64:15
**2:25** 93:25
**2:33** 100:3

**3**

**3** 44:3 54:6 56:3,4
**30** 27:16,22 99:16
**31** 60:7 64:14

**4**

**4** 27:23 56:7, 9,11 61:12 87:2,3,14

**5**

**5** 61:11 62:24 63:3 66:15,16 87:2,4,15 88:16 93:4

**6**

**6** 44:8 45:5 46:3,4 71:10, 24,25 72:12
**6:00** 8:18 52:19
**6:15** 8:23

**7**

**7** 76:15 77:5, 8

**8**

**8** 35:12 36:15,19 38:6 40:3 59:24 78:4,7

**9**

**9** 36:21

**A**

**a.m.** 49:25 92:10
**ability** 46:15 75:10 87:12
**acceleration** 68:15
**accept** 13:23 64:20
**acceptable** 86:11
**accepted** 7:12
**access** 20:24 21:22,25 22:8
**accessible** 14:20
**accommodations** 79:21
**accordance** 26:8
**account** 23:20 26:3
**accounted** 52:5 79:11
**accuracy** 25:4
**accurate** 72:3
**accurately** 20:22 21:9
**acknowledges** 98:2
**acquire** 24:20
**acronym** 81:22
**act** 40:14 41:15 58:8,9 64:5
**acting** 39:6 41:4,10,11 46:23 47:1 81:9
**action** 9:15, 19 10:7 41:4, 5,7 68:5
**active** 75:7
**activity** 25:19 55:13
**acts** 30:20 39:4 47:19 54:21
**actual** 50:9 57:7
**add** 81:4,12 84:9 95:22
**added** 34:5
**addition** 9:19 11:13 12:12 18:22 39:11 75:2,20

**additional** 95:6 99:10,16
**address** 10:20 15:9 49:1,11 64:11,12,23 78:19,20,22 81:4 88:13 89:3 94:17 95:6
**addressed** 6:24 64:11
**adjourned** 98:15 100:1
**Adjustable** 26:20
**admissibility** 33:23
**admission** 16:6 17:1 86:25
**admissions** 15:11,16,17, 18,22,25 16:1 17:2,11 86:4, 14,21,23 87:14,23,25 88:4
**admit** 28:24
**admitted** 16:8 17:15 34:20 53:14 54:5 56:2 78:5,18 86:4
**adopting** 16:1
**advance** 74:10
**advanced** 74:11
**advances** 74:9 75:3,6
**advise** 7:5,18 8:13 35:7
**advised** 15:12 50:19 58:21
**advisement** 15:13 91:23
**affirmative** 57:18,22 58:5 80:16
**afternoon** 8:11 97:2
**agencies** 81:9
**agent** 19:14, 17 42:12 83:5
**agents** 47:1, 11
**agree** 91:18
**agreed** 69:15
**agreement** 12:17 24:25 25:6 48:14 56:5
**ahead** 4:22 9:9 10:18 14:19 17:19 73:25 80:23 85:8
**aid** 14:2
**air** 7:3 49:17
**allegation** 66:2
**allege** 57:24
**alleged** 49:12 53:19 57:6 76:23
**allonges** 9:17 33:22
**allowed** 41:1 72:11 75:7
**allowing** 23:24 49:15 77:3
**altered** 33:13,16
**ambiguity** 88:18,19
**ambush** 49:10
**amend** 80:13, 17 81:3,12 84:5,9 89:6, 21 94:17 95:21 96:5 97:9
**amended** 86:20
**amending** 80:15 85:5
**amendment** 80:19,21,24
**amount** 23:19 68:18,21 69:1,6 73:13 74:11 75:1
**amounts** 70:17 75:22 76:8, 23,25
**AMS** 23:6
**analysis** 74:18
**analyst** 5:17
**and/or** 73:17
**announce** 97:22
**announced** 96:14
**announcement** 98:2
**anomaly** 37:23
**anticipation** 51:15 57:16 94:12,22
**apologize** 4:6 27:13 35:17 43:22 47:16 96:17 97:1
**apparently** 94:9
**appeared** 49:17
**appears** 94:11
**applications** 20:17
**approach** 28:12 34:24 48:12 54:8 98:9
**approve** 7:22
**April** 28:7 31:14 68:2 69:1 77:13
**arguably** 82:19,20,21
**argument** 10:24 14:5 15:15 33:25 41:17,21 47:25 53:4,18 57:4,12 65:17
**arguments** 10:22 51:15 57:13
**asserting** 64:7
**Asset** 48:13
**assign** 42:8 65:7
**assigned** 86:6
**assignee** 43:6 47:18 83:14
**assignment** 5:11 6:3,4 11:25 12:1,3, 10,12 26:13 35:8,9,11,13, 23,24,25 36:2,5,19,20 37:8 38:5 40:2,5,18 41:9 42:16, 21,23 43:5,7, 8,10,11,14, 17,19,24,25 44:2,5,6,10, 11,14 45:2 47:6 80:11,12 81:4,13,14, 19,21,25 82:25 90:7 94:10,21 95:8,9,23 96:4,19 97:7, 10
**assignments** 9:20 12:13,14 25:9 31:4 35:2,4,5,17 36:24,25 37:1 39:15 41:19 43:2 44:18 45:16,21 46:4 48:11,25 54:12,19,20, 24 55:3,12,

19,21,25 61:12 81:6 82:13 86:7 88:6,19 94:17 95:10 96:3
**assigns** 48:22
**assume** 62:19 77:21 87:8
**assumed** 63:18 87:6
**assuming** 50:7 87:21 90:24 95:23
**attached** 9:18,21 11:1 27:19 33:22
**attachment** 52:17
**attempted** 9:24 44:20
**attempting** 19:24 41:17 95:3
**attention** 44:17 48:19 51:19 52:2
**authority** 7:13,17
**Automatic** 90:20
**aware** 50:20, 24

**B**

**back** 31:14,25 36:17,18 38:5 40:20 42:20 43:23 47:13 60:15 64:11, 18,20 66:9 68:24 78:13 90:16 91:25 93:22 95:20 98:23
**background** 8:14,20
**bad** 16:18
**bailiff** 72:14 93:14,21
**balance** 68:19 69:7 74:8
**Bank** 35:10,25 41:14
**based** 21:10 26:22 30:13 31:22 32:12, 15 44:24 53:8 55:18 68:3 75:14 88:18 90:3 95:23
**basically** 22:16
**basis** 20:4 21:20 33:23 36:3 38:9,21 39:21,23 44:21 70:13
**Baton** 22:20, 25 23:2,4
**beast** 85:21
**Beauvais** 91:6
**beginning** 24:7
**begins** 76:21
**behalf** 9:12 10:22 18:24 25:2 39:4 40:13 41:4, 11,18 46:23 47:19 81:9 82:8
**belief** 94:20 97:6
**bench** 13:14
**big** 79:4
**Bill** 11:14
**bit** 6:13 59:15
**boarded** 70:1
**boarding** 25:13 32:3 55:3,5 73:8, 16,20 74:13, 16
**bold** 42:1
**borrower** 19:9 25:11 64:19 75:21,23
**borrowers** 25:22 63:11, 16,23 64:6 68:6
**box** 23:14
**break** 9:5 49:21,22 61:15 91:20, 21 96:23 97:5
**breaks** 5:9
**briefly** 6:23 7:5 63:7 86:18
**bring** 9:15 42:9,17 44:17 77:6 81:1
**bringing** 41:7 48:19 57:14 81:3
**brought** 10:6 51:19
**building** 22:21,22
**burden** 67:2
**burdensome** 53:6
**business** 19:5,8,21 24:13 25:19 26:8 29:7 31:1,18,19,21 32:7,12 55:13 62:11 65:15 71:5
**buyers** 94:23

**C**

**California** 8:17,23 22:19 23:1,25 65:7 92:16 95:14 96:22
**call** 7:20,23, 25 8:1,3,23 9:4 12:2 14:11 17:22 23:6 42:12 90:17 93:13, 18 95:13,18 96:22
**called** 9:5 18:2 72:21 87:22
**calling** 8:15
**calls** 87:18 90:12,19 92:21
**capacities** 47:2,21
**capacity** 30:25 38:8,23 39:8,20,25 41:11 46:21 47:18 55:1
**Capital** 4:3, 12 9:25 10:11 43:20 44:13 47:8 48:14 90:10 92:13 94:2
**case** 5:9,15, 19,24 6:24 12:6,7,11 15:9,14,17 16:11,23 17:13,17 21:23 23:11 27:5 36:23 41:12,13 43:1 45:8 46:15, 18,19 48:1 51:3 52:14 59:25 60:3,5, 10 66:19 74:23 75:17, 18 80:14 83:16 85:18 86:19 87:9, 11,12 91:4,15 92:12 93:20

95:15 96:15 98:1
**cases** 5:24 12:11 15:20 16:9,20 33:11 41:23 82:10 85:21
**Catherine** 9:12
**cell** 9:2
**century** 24:8
**certified** 62:10 64:17, 20 65:3,5
**chain** 7:15,23 12:2,4,13 82:12 86:9 87:20 88:17 95:10
**challenge** 81:1
**challenged** 48:25
**challenges** 80:11 81:5
**challenging** 5:10
**chance** 50:1 51:16
**characterization** 37:25
**characterize** 10:3
**charged** 74:10
**charges** 70:2
**Charles** 5:1 9:13 25:23 26:1 32:14,17
**check** 23:15 74:21 75:4
**checklist** 74:17
**chronological** 62:17
**circuit** 52:6
**circuits** 52:7
**circumstances** 36:24 37:21 43:3
**clarification** 36:17 42:20 43:22 46:3 54:11
**clarify** 27:7 43:6 83:21 88:22
**clarity** 96:17
**clear** 67:16 86:9 87:20 88:17 96:16 97:17
**clerical** 80:20
**clerk** 27:8, 16,22 34:17, 18,19 54:3 56:7 66:15 71:12 72:15 99:20
**client** 13:12 33:17 59:17
**clients** 9:24 51:7 61:22 65:18
**clock** 49:23
**close** 15:4
**closing** 31:14 94:12,22,24
**coast** 22:18
**collateral** 25:8 26:12 29:8
**collection** 41:5 58:8,10
**collectively** 29:6,9,10 30:13 31:2
**comfortable** 14:17
**communicate** 75:9 92:15
**company** 18:14,22,24 20:10 22:24 24:5,6,24 25:1 31:12 38:14,24,25 39:25 46:22 55:13 63:14, 20 64:3 75:11
**company's** 31:20 62:11 73:20
**compel** 93:3
**compelling** 98:9
**complaint** 9:21 10:25 11:1,8,14 15:22 33:8,9, 14,17,18,20 74:25 75:18 80:13 84:9 85:14 98:8,17 99:11
**complete** 78:20 95:11
**compliance** 18:19
**complied** 57:24
**comply** 57:19
**composite** 9:22 13:11 33:2 35:2 48:11 54:11, 18 55:24 56:2,8 60:16 61:10 62:23, 24 63:3,15 78:4
**compound** 87:18
**computer** 20:24 21:4 62:1
**conceding** 11:5
**concern** 53:1 88:15
**concerned** 17:18 40:25
**concluded** 100:3
**conclusion** 87:19
**conclusive** 13:24
**condition** 10:4
**conditions** 5:11 6:15 9:23 57:12, 13,19,24,25 58:2,15 67:10
**conduct** 89:7
**conducted** 19:21
**conference** 15:12 51:10
**confirm** 99:17
**confirmation** 7:11
**conflict** 82:20
**conflicting** 9:20
**conform** 80:18
**conforming** 99:19,22
**consideration** 80:2
**considered** 73:8,12
**consistent** 5:4 36:18 52:7
**Consumer** 58:9
**contact** 8:3
**contemporaneously** 20:15
**contents** 50:8,10
**contested** 53:10 67:4,16 79:13

**continuance** 97:9,15
**continue** 24:18 42:18
**continuing** 21:7
**continuous** 90:21
**contracts** 18:23
**contradict** 87:9
**contradictory** 15:21
**conversation** 95:17
**conversing** 52:9,16
**copies** 25:7 26:16 32:10 33:16 34:8,9 56:22 58:24 60:25 61:13, 14,16 63:18, 19 78:13 98:14 99:23
**copy** 26:17,19 27:3,9 29:13, 18,20,23,25 30:3 35:19,20 56:12,14,19, 23,24 69:16, 17,20 71:1 77:12,14
**Corp** 25:15
**corporate** 18:14 74:10 75:5 83:24
**Corporation** 18:7,9 19:2 24:20 39:3 40:11,18 41:14 55:15 58:23 63:2 69:23 70:24 73:3,12 74:19 76:6
**Corporation's** 19:5 74:1
**correct** 5:13 10:17 16:15 25:25 48:18 62:21 63:4 68:9,10,16 70:11 71:8,21 76:7,9,10 80:25 82:14, 15 83:2,9 95:16 96:11, 18 97:16,18 98:21
**correction** 83:10
**correctly** 25:24
**correspondence** 11:16 18:21 56:13 58:22, 25 59:1,13 63:2,7,8,9, 10,12 64:1 66:10
**corresponds** 11:2
**costs** 74:11
**counsel** 13:1 14:24 18:10, 11 20:19 21:15 24:18 26:15 27:23 29:22 38:14, 23 39:20 46:21 48:12 49:10 50:1 51:17 55:2 56:14,22,25 58:20 61:21 64:2 69:15 70:25 77:14 92:15
**count** 81:4 84:10,11 95:22
**counted** 5:3
**country** 39:19
**couple** 4:18 64:18 99:21
**court** 4:3,7, 8,11,16,18 5:3,14,21 6:7,14 7:6,9, 15,19,21 8:5, 9,13,15,18,22 9:1,8 10:3, 10,14,18 11:4,11,22,25 12:6,15 13:3, 8,13 14:4,11, 14,16,22,24 15:2,3,8,24 16:17,21 17:3,5,24 20:3,9 21:12 22:15,21,25 23:3,22 24:3 25:3 26:14, 18,24 27:2, 11,12,21,24, 25 28:1,4,5, 9,11,13,16,20 29:3,10,17,21 30:8,9,12 31:11,20,24 32:4,25 33:2, 10,15 34:10, 13,16,19,25 35:7,14,18,21 36:6,12,16 37:3,5,14,17, 22 38:1,7,18 40:7 41:20 43:11,23 44:11,23 45:1,6,11,21, 24 46:1,6,11, 17 47:10,13 48:1,3,22 49:2,5,7,20 50:1,12,19,21 51:1,6,12,21 52:12 53:25 54:9,14,25 56:2,6,8,20 57:1,15,18,23 58:6,13 59:6, 9,21,25 60:3, 6,9,13 61:3, 5,9,15,17 62:7,17,21,23 64:16,23 65:6,14,17,23 66:9,14,17,23 67:3,6,13,18, 23 68:23 69:19,21,22 71:4,7,10,13, 19,23 72:9, 14,17,24 73:24 74:3 76:2,20 77:2, 10,18,20,25 78:3,9,14,16, 24 79:3,11, 14,18,22 80:3,10,17 81:5,6,14,17, 24 82:3,17, 21,24 83:2, 12,18,23,25 84:3,11,13,17 85:11,17,20 86:12,14,16, 21,24 87:3,6, 10,13,21 88:12,24 89:14,20,24 90:3,11,15,20 91:12,19 92:6,9,12,20, 24 93:6,11, 19,24 94:1,6, 16,18 95:12, 19 96:9,13, 17,20 97:3,9, 12,16,18,21, 23,25 98:6, 10,12,15,19, 22 99:4,8,13, 18,21,25
**Court's** 7:7 12:21 28:23 29:5 33:8

36:22 44:17 48:19 70:8 79:12 80:2 85:25 95:4
**cover** 71:19 84:20,24
**coverage** 63:13
**covered** 16:5 17:11,12
**created** 49:18 51:2
**creating** 22:12
**creation** 30:23
**Credit** 64:5
**cross** 80:3,5, 6,8 89:21
**cross-examination** 89:7
**cross-examine** 89:10
**current** 9:14 47:8
**custodian** 5:17 24:12, 15,17 71:7 72:9 83:7
**custodians** 24:7
**customs** 24:13

D

**daily** 21:20
**damages** 78:9, 15 79:7,8
**data** 20:25
**date** 10:15 23:18,19 27:11,14,22 36:5,8 42:23 44:1,7,14 51:12 68:1 70:5,6 73:4 74:12 76:23, 24 91:10
**dated** 27:21 28:6 35:11 36:5,15,19 37:10,19 38:5 40:3 42:21 45:4 46:2 59:16,18,19, 23 93:4
**dates** 14:3 36:11 37:7,12 43:23 59:22 62:20
**day** 4:20 5:5 8:11 34:3 53:7 67:9
**days** 24:17 98:24 99:16
**deal** 7:2 14:20 22:11 42:5 48:5 79:4 80:22 84:21 85:2 88:5 91:16,24
**dealings** 18:23
**debt** 9:25 10:5,7,12,24, 25 11:18 53:21 56:16 57:6,8 58:8, 11 60:11,18, 23 64:5 68:14 75:13,25
**December** 36:21
**decided** 7:2 15:19
**decides** 81:6
**decision** 91:2,7 92:3
**decisions** 75:9
**deemed** 16:8 86:4
**default** 67:16 68:11 70:5 73:4 76:23 91:9,10,14
**defaulted** 67:17 68:6
**defendant** 18:16 32:1 48:21,23 57:25 58:23 61:21 99:15
**defendant's** 7:11 13:1 15:10 47:24 52:25 53:4 56:15 57:4 59:4 66:2 81:7 91:22
**defendants** 4:16 9:13 12:4 55:20 58:12 59:1,13 63:3 66:19,25 67:17 77:13 80:15 93:5,7
**defense** 5:10 6:1 9:9 17:10 57:18,22 58:5,14,20 59:12 67:4 70:25 85:7 89:6
**defenses** 9:11,14 10:2, 20 80:16
**Delaware** 89:12
**demand** 77:13, 18,21
**demonstrated** 24:4
**demonstrative** 13:16 14:2
**demonstratives** 13:17
**denied** 16:24 17:15 86:22 87:6,16 95:21 96:5,10
**denies** 87:20 88:16
**deny** 45:12 80:10 89:20 96:11,17 97:12
**denying** 97:14
**department** 21:3,21 23:12,17 25:13 63:14 74:14
**depending** 23:9 93:17
**depends** 47:17 84:11
**deposed** 84:25
**describe** 18:11 30:16 38:7 43:11 63:8,21,25 69:22 72:24 74:3,16
**description** 88:20
**detail** 35:4 40:6 41:12
**detailed** 74:17 95:5
**details** 7:8 44:11
**determined** 28:22
**develop** 46:17
**develops** 17:20
**dial** 90:18
**dialing** 90:18,21
**dialings** 90:20
**difficult** 80:22
**DIRECT** 18:4
**directly** 8:3 9:25

**disclosed** 49:16
**disclosure** 88:25
**discovery** 93:3 98:9 99:10
**discrepancy** 88:6
**discretion** 49:8 85:25
**discuss** 24:23 88:5
**discussed** 72:20 88:9 95:13
**discussing** 43:4 47:5 86:18 95:13
**discussion** 7:7 11:12 16:21 17:6 38:2 51:14 75:24
**discussions** 8:8 51:18 58:20
**dismiss** 85:13 96:7 98:18
**dismissal** 44:22 45:7 89:23 90:2 91:22 96:14 97:20 98:3
**dismissed** 91:5
**dismissing** 79:3
**dispositive** 98:2
**dispute** 9:24
**disputed** 12:4 15:16
**disputing** 12:4 16:19
**distinction** 32:5
**District** 91:6
**docs** 26:12
**document** 17:9 33:13 49:3,16 50:2 51:1 52:3 53:12 69:23 70:10, 17,20,23,24 72:18,19,25 73:7 76:21 95:1
**documents** 6:18 14:18,21 15:23 18:21 25:8 26:4 29:8 30:15 31:7,9,12,18, 23 32:7,10 38:25 47:5,22 50:7,8,9 51:9 53:14,21 55:9 59:2,3 68:4 70:21 73:7, 17,22 99:16
**doubt** 49:16
**down-in-the-sand** 9:2
**drafting** 21:19
**dreamed** 41:24
**due** 68:6,13, 19 70:6,7 74:8 75:1 76:8,25
**duly** 18:2
**duplicate** 59:5
**duties** 18:12 19:25 20:7 22:24 24:5 25:1 64:2
**duty** 19:17,25

**E**

**e-mail** 52:17, 20
**e-mails** 52:10,16
**earlier** 55:7, 22 56:13 73:9 86:18
**early** 8:11
**east** 22:18 78:22,23
**easy** 85:2
**economy** 80:9
**edification** 7:7 70:9
**effect** 12:12 16:18 41:18
**eighth** 58:4
**electronic** 24:10 35:9 39:4
**elicit** 17:8
**eliciting** 31:17
**else's** 19:24
**employed** 18:6
**employees** 20:11,12 21:3,11,13, 16,20 22:11 24:2
**encouraged** 15:19
**end** 34:3 45:8,13 46:18 67:9 68:4 81:2
**ended** 6:9
**enforce** 58:10 93:3
**engaged** 40:13
**enjoy** 17:6
**enlarge** 69:16
**enlarged** 69:17,20
**ensure** 20:21 21:5
**ensuring** 21:8
**entails** 18:12
**enter** 22:6 23:9 24:9,22, 24 36:4
**entered** 23:8, 10,18 25:5,14 26:24 54:13 55:4 70:17 74:14
**entering** 21:9
**enters** 72:7
**entire** 71:15, 16 99:2
**entities** 44:19 46:22, 25 47:10,21 83:1 86:8 88:7
**entity** 83:4 86:7 88:20 90:6
**equitable** 12:7
**equity** 12:10
**erroneous** 94:13 95:7,8 96:19 97:8,10
**escrow** 74:9
**essentially** 16:1
**establish** 6:17 38:20 67:22 90:4
**established** 13:24 20:10 77:3
**establishing** 5:23 43:4
**Eureka** 22:19 23:25
**Evans** 79:5
**evening** 8:11 52:19
**event** 19:12 31:6 97:19
**events** 30:15, 20

**evidence** 6:25 9:16 11:21 13:16 28:21, 25 32:24 34:7,9,23 44:24,25 49:15 52:1 54:13 55:25 56:9,11 60:22 65:23 66:16 71:25 77:4,8 78:5,7 79:25 80:18 87:8 88:5 89:16 94:8,15 95:4 96:4
**exact** 11:2 58:24
**EXAMINATION** 18:4
**examined** 18:3
**exception** 7:21 29:8 31:2 33:12
**exchanged** 51:9
**exciting** 97:2
**exclusively** 5:18 71:19
**excuse** 7:4 12:23 22:2 27:17 32:23 43:2,24 46:8 47:15 48:24 53:12,20 55:15 72:2 73:8,20 76:11 79:17 81:8 82:12
**executed** 31:9 32:13,16 67:25 69:1
**execution** 31:7
**exhibit** 9:22 13:11,22 28:23 30:1 33:2,3,4 34:20,21 35:2 48:17 50:6, 14,16 53:15, 25 54:3,6,12, 19 55:24 56:3,9,11 57:1,10 59:11,12 60:16 61:10 62:23,24 63:3,15 66:15,16 71:10,19,24, 25 72:12 76:15 77:3,5, 8 78:4,7
**exhibited** 28:23
**exhibits** 7:1 12:16,18,21, 25 13:2,4,6, 17 33:1 34:6, 11,12,22 52:9 57:17 59:4,10 65:23 77:22 78:18
**existed** 49:17 50:23 51:4
**existence** 16:19 50:15, 18 93:10
**exists** 95:1
**experience** 83:11 88:18
**expert** 38:10
**explain** 21:12 25:3 38:7 41:22 45:6 46:13 51:20
**explanation** 51:1
**explicit** 84:20
**express** 82:24
**extensive** 95:17
**extent** 19:23 41:16 56:17 72:6 87:17 88:10,11
**extra** 35:19
**eye** 38:3

**F**

**F-o-g-l-e-m-a-n** 17:25
**face** 37:13
**face-to-face** 52:10
**fact** 53:21 66:3,4 74:23 78:15 79:7 80:10 90:4 97:8
**facts** 5:23 11:13 15:21 46:17 72:3
**factual** 66:24
**failure** 57:6, 19
**Fair** 36:6 58:8 64:5
**fairly** 85:2
**familiar** 19:4 20:18 25:21 39:13
**familiarity** 24:6 39:13
**Fargo** 35:10, 25 36:14,20 38:6 40:3,19 41:9,11,14 42:22 43:5
**favor** 86:1
**FCI** 72:19,22 73:1 76:21
**February** 27:23 44:15 46:9 59:18,24 60:2 64:15
**federal** 58:7
**feeling** 53:18
**fees** 74:10 75:6,10 76:9
**felt** 75:6
**figure** 99:3
**file** 16:23,25 26:24 27:12, 24,25 28:4 30:8 32:11 33:18 34:10, 13 39:6 40:22 50:6 55:5 68:5 86:20 95:2 97:11
**filed** 9:19 27:5,8,12,16, 22 28:3 29:21 33:7,17 34:9 40:12 59:25 60:5,11,12,19 62:3,12 63:11 64:7 65:19 74:25 75:18 85:14 86:17 98:17,18
**filing** 16:25 27:15,19,21 29:22 33:9,14 34:14 60:24 76:1
**final** 89:5
**finality** 98:1
**find** 61:25 87:5
**finds** 81:5
**fine** 7:9 15:2 28:20 32:4 37:22 42:1 71:4 79:16 92:1
**firm** 8:1,4
**Fixed** 26:20
**fleshed** 57:20
**floor** 22:21
**Florida** 42:4 58:8 64:25
**flow** 48:9
**flush** 6:14
**fly** 42:4
**focus** 9:14

67:9
**focusing** 6:22
**Fogleman** 5:1 7:25 11:10, 14,24 17:22 18:1,6 21:15 29:14 35:1,5, 7,22 38:5,23 46:21 48:9 54:18 56:12 63:1 67:25 69:22 72:1 77:12 83:13
**folks** 5:3
**follow** 14:4
**font** 72:20
**foreclosure** 33:11 41:4,7 64:7,9 68:5, 13 75:7 91:9
**foreclosures** 40:22
**forgot** 43:23
**form** 47:18
**formal** 84:12 85:23
**formally** 48:11 85:1 89:24
**forms** 23:16
**forward** 7:19 8:21 9:15 10:8 66:13 81:2 99:13
**foundation** 38:12 68:21 69:11 70:13, 16 73:18
**fourth** 43:14, 25 44:2,5
**frankly** 60:17 61:7
**front** 30:11
**full** 68:8 88:24
**function** 20:10 21:4
**functioning** 21:5
**funds** 20:15
**furnished** 77:23
**future** 52:13

G

**gathering** 60:21
**GDBT** 44:7 45:4 46:5 47:7 82:6 83:4 84:1 88:20 89:11 90:7,8 94:11 97:8
**GDBT-1** 43:18 81:24 88:14
**general** 18:10,11 20:19 21:15 38:14,23 39:20 46:21 47:9 55:1 64:2 69:24 83:13
**generically** 57:24 58:1
**give** 6:17 29:10 38:14 40:6 41:12 48:23 49:8 56:14,19,25 60:14 81:7 83:21 92:6 93:20
**giving** 89:15
**glad** 54:4
**good** 10:21 12:8 38:4 79:14 94:6
**Goshen** 43:15, 18,20 44:1,6, 10,12,18,20 45:2,22 46:5, 7,9 47:6,7
48:14 81:21 82:1,8 83:5,8 84:1 86:8 88:6,13 90:7 94:10 97:7
**gotcha** 10:14
**govern** 22:10
**grant** 80:10 90:23 91:4
**granted** 93:2
**granting** 91:13
**Group** 9:25 43:21 44:13 48:14
**guess** 30:1 39:1 45:6 46:11,12 60:25 84:6 85:3,5

H

**half** 76:12
**half-hour** 9:5
**hand** 4:25 15:6 17:7 53:22
**handed** 27:20 35:5
**handing** 26:19,22 27:1 29:13,19,20 35:1 56:12 77:12
**handled** 85:15
**hands** 5:4 33:8
**happen** 41:5 84:19
**happened** 34:4 37:18 85:13, 14 92:1
**harm** 45:11
**head** 92:18
**hear** 5:25 6:23 15:3,6
37:14 48:3 53:7 61:18,19 80:23 91:20, 23 96:24 99:5
**heard** 13:8 37:9 38:18 71:17 83:12, 15 88:12 99:5
**hearing** 16:12 61:20 87:25 88:2 96:21 98:23
**hearsay** 20:6
**held** 87:24
**helpful** 13:18 14:2 38:3
**helps** 14:4
**Hey** 52:21
**highly** 49:16
**hint** 6:17 48:4
**histories** 25:11
**history** 69:14,23,25 70:1 71:16 73:3,4
**hold** 39:5 40:23 47:11, 22
**holder** 83:14
**holders** 46:23
**holds** 15:18
**holes** 13:20
**Honor** 4:10 7:4 14:10,25 15:8,12 17:21 24:19 26:16 27:7,13 28:8 32:22 34:15 35:17 38:22 42:19 44:16 45:15,23 46:14 47:24 48:13 49:24 50:17 51:11 52:11 54:10 55:23 58:19

Case 4:17-cv-10093-AOR Document 37-12 Entered on FLSD Docket 07/02/2018 Page 111 of 122


61:16 62:6,13 65:22,25 66:12 67:15 68:24 69:19 70:19 71:6,9, 22 77:9 78:8 79:2,17,20 85:19 86:17 88:15 90:14 92:4,8,17 93:23 94:3 96:8 97:1 100:2
**hour** 88:23
**housekeeping** 14:13 93:2

I

**idea** 48:9
**identification** 54:5,7 56:5
**identified** 35:22 58:16 85:6
**identifies** 42:10
**identify** 9:10 10:12,18 35:24 56:21
**identifying** 28:25 29:12
**ignore** 96:2
**III** 36:1 42:22 43:12, 13,15
**image** 27:18
**impact** 61:6
**impression** 66:24
**in-house** 47:1 82:11
**include** 25:7 63:18,20 68:8,15 76:8
**included** 50:4 53:15 59:4
70:14 77:22 82:12
**includes** 63:16
**including** 35:2
**inconsistency** 49:12
**indefinitely** 84:4
**indicating** 74:8
**individual** 63:7 72:7,10
**individual's** 20:6
**individually** 29:6 31:3
**individuals** 21:9
**indorsements** 27:9 28:19 33:9,21
**information** 11:2,19 20:14,22 22:2 25:7,12 30:19 47:9 63:17 72:7,10 74:13 89:15 94:16, 19,20 95:5 97:5
**initial** 5:24
**input** 20:14 22:1 71:15,16
**inputted** 20:22,25 72:10
**instance** 40:8 41:8 75:4,5
**instructions** 12:21
**insurance** 63:13,14
**integrity** 20:25
**intention** 58:21
**interact** 21:20 39:15, 21
**interaction** 38:24
**interactions** 22:7 25:11
**interest** 41:1,15 80:9
**interesting** 17:6
**interject** 7:5
**interlocutory** 16:12
**intertwine** 41:17
**introduce** 48:10,11 56:20 58:21
**introduced** 55:22 96:3,4
**investor** 24:22,25 25:2,6 40:10, 23
**investor's** 41:3
**investors** 18:17,23 39:5 94:8
**involuntarily** 91:5
**involuntary** 44:22 45:7 89:22 90:2 91:22 96:6
**involved** 18:13,15,17, 19 21:18,24 22:12 39:12 85:18
**issue** 8:12 12:1 14:25 17:16 37:3,4 46:15 53:2,9, 16,23 54:1,17
58:2 60:14,17 66:18 67:10, 11 78:15 79:6,9 80:22 81:5 84:20 85:1 88:25 95:9 98:20
**issues** 6:23 38:3 39:18 48:6 57:11 66:24 80:12 89:3

J

**January** 27:16,22 60:4 64:14,15
**Jenkins** 4:5, 10,14 5:20 7:4,10,16,25 8:7,10,17,19, 24 9:7 10:21 11:9,13,23 12:3,19 14:10,13,22 15:8 16:16,19 17:4,21 18:5 21:14 24:19 26:11,15,19 27:7,13 28:8 29:1,4,12,20 30:3,6,25 31:7,17,22 32:2,22 33:1, 3 34:15,24 35:1,16,19 36:10,22 37:11,16,20, 24 38:13,22 42:19 45:15, 23,25 46:2,8, 14,20 47:15, 24 48:8,18 49:4,7,24 50:17,22 51:4,11,13 52:11,25 54:8,10,16

55:23 56:4, 12,19,24 57:3 58:19 61:10, 16 62:6,13,25 65:12,22,25 66:12 67:15, 20,24 68:24 69:14,19 70:19 72:13, 16,18 73:19 76:11 77:7,9, 12,17,24 78:6,8 79:2, 10,12,17,20, 24 80:8,25 81:16,19,25 82:6,18,23,25 83:3,17,20,24 84:1,8,16 85:19,23 86:17 87:11, 16 88:9,15 90:1,13,19 92:4,8,17,22 93:9,16,23 94:3,7 95:16 96:7,10,16 97:1,4,14,17, 19,24 98:5,13 99:15 100:2
**job** 19:25 21:4 24:5
**joint** 53:9,23
**judge** 6:8,18 16:5 17:10 79:5 84:19 91:1,24 99:6
**judgment** 78:11
**judicial** 80:9
**June** 60:5 78:10,13 79:5 87:23 88:1 98:23,24,25 99:3
**jury** 13:14 38:1

**K**

**keeping** 21:17 22:12
**Key** 64:23,25
**kick** 16:10
**kind** 5:9 12:16 17:5 24:15 41:17 50:4 67:13 76:3 89:2
**kinds** 33:21
**knew** 51:7
**knowledge** 19:4 20:2,6, 11 21:10 22:3 24:1,16 30:18,19 31:9 38:21 39:24 54:23 66:21 73:16 75:25 82:24

**L**

**L-i-c-i-s** 9:13
**labeled** 12:20 26:20 48:13
**lack** 21:10 53:5,19 69:11 74:18
**laid** 38:12 70:13 73:18
**Lane** 64:24 78:22,23
**laptop** 4:6
**late** 76:9 88:23 98:23
**late-breaking** 52:15
**law** 8:4 12:6, 7,8,11 15:9, 14,17 16:7 36:23 42:13 43:1 46:15,18 48:1 80:14 86:19 87:9,11 90:23
**lawsuit** 42:9, 17 57:14 60:19,20,24 62:3,12 63:11 65:19,20 76:1
**lawyer** 33:16 51:23
**Lawyers** 85:21
**lay** 68:20
**layout** 22:15
**leading** 37:7
**leaps** 82:21
**learned** 96:22
**leave** 80:13 81:3,12 84:8, 9 94:16 97:9
**ledger** 70:10, 22 71:1 72:3
**left** 34:2
**left-hand** 72:22
**legal** 17:6 20:4 41:17,18 60:14,17 61:6 74:10 75:6 87:18
**lender** 40:16 41:25 72:19 73:1
**letter** 10:16 11:6 59:19 75:21 91:14
**letterhead** 70:18
**letters** 11:17 57:1 59:6 61:21,23 63:10,16,19, 21,22 64:6, 10,13 65:4 66:4,5 76:3 77:13,14,17, 18,22
**level** 7:14,18
**Licis** 5:1 9:13 25:23 26:1 32:14,17
**light** 7:20 49:13
**lightbulb** 84:14
**limine** 12:22, 23 15:10
**limitation** 32:5
**limited** 20:24
**list** 30:1 48:17 50:14, 16 53:15 57:2,10,11 59:11
**listed** 50:16 57:17 78:21
**litigated** 18:13,18 21:24
**litigation** 18:16 39:16, 18
**LLC** 36:1 42:22 43:13, 16,20,21,25 44:1,6,12,13 46:5,10 47:6, 8 81:22 82:1, 8 83:5,8 84:1 97:7
**loan** 5:17 10:13 11:7 22:4 23:4 25:21,22 26:4,6 30:14 31:23 32:13, 16 38:8,25 45:19 47:4,22 50:6 64:7 68:4 69:14, 23,25 70:3,15 71:16,20 72:21 73:1,3, 4,5,11,16 74:6,11,15,22

76:13,18,19 77:1
**loans** 19:6 24:21 25:4,7, 16,18 39:11
**located** 8:2
**lock** 23:14
**logo** 72:22
**long** 15:2 16:17 49:17
**longer** 44:21
**looked** 27:23 79:5
**lot** 5:14,22 13:6 38:17 46:4 65:15
**Louisiana** 22:20
**lunch** 90:15 91:21 92:10, 13 95:17,20

**M**

**Madam** 34:16
**made** 19:11 23:14 30:15, 18 45:8 50:23 54:20,24 68:7 70:2 74:9 75:3 76:4 95:2,13
**magically** 49:16
**mail** 61:19 64:16,19,20, 22 65:3,5
**mailbox** 65:13 66:6
**mailed** 66:8
**maintain** 21:4 39:9,17
**maintained** 25:19
**maintaining** 22:13
**make** 5:14,21 7:21 8:23 15:2 33:10 45:13 54:16 55:16 61:16 75:9 80:1,6 89:5,9,17 90:19 91:20
**makes** 5:24 80:21
**making** 20:14 95:24 96:21
**management** 98:16
**March** 42:24 50:15 86:15
**mark** 34:16,19 61:9 66:15
**marked** 54:3, 5,6,15 56:5 60:15 63:1 77:6 78:4
**Masson** 4:3,12 5:1 9:13 25:22 32:14, 17 64:11 92:13 94:2
**Master** 72:21 73:11 76:13
**material** 78:15 79:7
**materialized** 94:12,25
**matter** 14:13 15:13 19:1 21:24 47:9 64:6,9 68:4 76:5 93:1 99:8
**mattered** 52:14
**matters** 15:19 18:14,15,16, 18
**meaning** 10:10,11 90:7
**means** 37:18
**meant** 6:1
**mechanism** 75:8
**meet** 24:23 52:8
**member** 39:3, 7,9,17
**members** 40:22
**memorized** 27:14
**mere** 15:25
**merged** 41:14
**merits** 15:20 87:12
**MERS** 36:19 38:6,7,11,19, 21,25 39:3,7, 9,12,14,19,21 40:3,5,9,18, 19,21,23 41:5,8,11,25 42:1,7,10,14, 16 43:5
**MERS'S** 41:22
**met** 51:14
**method** 75:16
**mid-20th** 24:7
**mid-trial** 84:18
**middle** 7:6 16:3 45:8
**midnight** 52:20
**midst** 80:22
**Milhausen** 8:2 68:5
**mind** 14:22 62:18
**minute** 24:16 53:1,4 59:21 62:15
**minutes** 5:8 99:22
**misrepresent** 94:18
**misrepresentations** 50:22
**missed** 70:4
**missing** 78:21
**misspelled** 80:20
**moment** 4:6 77:9
**money'** 10:16
**month** 62:4 67:7 98:25 99:2
**months** 88:1
**moot** 93:17
**morning** 4:19, 21,24 8:18 10:21 52:24
**mortgage** 5:11 6:4,5 9:20 12:8,9 19:6 25:9 26:13 27:16,20 29:13,16,23 30:9,13,24 31:1 32:1,13, 23 33:4 34:11,21 35:3,6,9,15, 17 36:24,25 37:1,8 39:4, 5,7 40:2,5,6, 8,10,11,12, 17,18 41:3, 13,18 42:6,9, 13 43:2,16, 18,20 44:1,6, 12,18,20 45:16 46:5,10 47:6,8,14,15, 18 48:12,14 50:6 54:12, 19,23 55:3, 12,19,21,25 58:10 61:12 67:25 68:25 78:25 81:6, 13,21 82:1,8 83:5,8 84:1

86:6,7 88:14, 19 90:6 94:10 95:8,9 96:19 97:7,10
**mortgagee** 42:2,6,10,14
**mortgages** 26:13 32:7 43:2
**motion** 12:22, 23 15:10 16:14,24,25 44:23 45:7,13 48:4,7 78:10 80:1,7 81:11 85:12 86:22 89:6,9,18,20 90:24 91:4, 13,22 93:3 95:6,21,25 96:5,6,10,11, 18,21,25 97:3,13,14 98:2,18 99:4
**move** 7:19 8:20 10:8 31:3,4 41:2 44:22 66:12 72:13 80:12, 17 89:22 90:2 99:13
**moved** 54:17
**moving** 40:19 41:8 43:10 44:4
**Mueller** 4:17 5:13 6:6,12 9:12 10:5,11, 17 13:5,10 14:1,25 19:23 20:5 21:7 23:23 25:25 26:21 27:4,25 28:2,10,12, 15,19 29:15, 18,25 30:5,7, 10,22 31:5,8 33:6,13 35:20 36:3,8 37:4,6 38:9 41:16 44:16,25 45:4,10 48:16 49:6,14 50:3, 13 54:22 56:1,17 57:9, 16,21 58:4,7 59:8,16,23 60:2,4,7,10 61:2,4,8,13 65:2,16,21 66:21 67:2,5, 12 68:20 69:11,18 70:12 71:14 72:6 73:15 75:24 76:16, 21 77:16,19, 21 78:2,17 85:9,12 86:3, 13,15 87:2,5, 7 89:10,17,22 90:2,4 91:8, 18 93:1 98:7, 11,14,18,21 99:1,7,12,24
**multiple** 9:17 12:11 90:20

**N**

**NA** 35:10,25
**named** 40:9
**nature** 7:13 35:8 38:7,11 59:2 63:8 71:3 80:20 85:21 87:18 89:12
**necessarily** 13:5 33:16 40:7 47:20 82:7,9
**needed** 5:8 49:9
**Newbury** 36:1, 14 41:10 42:22 43:6, 12,15,24,25
**newly-produced** 50:2
**next-to-last** 27:10
**nice** 8:25
**night** 49:4,9 50:18,20,23, 24,25 51:3,15 52:19
**nominee** 39:5 40:10,12,14, 16 41:2,25 42:3,7,11 82:8 83:15
**non-existence** 99:17
**non-final** 16:12
**non-issue** 66:11
**non-jury** 14:16 91:1
**non-performing** 25:16
**normal** 31:21
**note** 4:3,12 6:4,8 9:18, 19,25 10:11 12:8,9 25:9 26:12,20,25 27:8,9,12,15, 17,18,19 28:6,18,22 30:13 31:1 32:1,16,23 33:3,7 34:10, 20 35:14 40:24,25 43:20 44:12 46:23 47:8, 12,13 48:14 58:10 66:20 67:17,25 68:16,25 69:1 78:25 90:5,9 92:12 94:1
**notes** 9:17 32:7
**notice** 27:15, 19,21 34:13 58:14 99:2
**noticed** 78:19
**November** 35:12 36:19 37:15 38:6 40:3 44:8 45:5 46:3,4 60:5 64:14 68:7 70:7
**nuances** 6:15
**number** 5:5 35:3 39:11 61:11,12 63:3 68:22 69:13 78:21 87:2 88:16
**numbered** 86:25
**numbers** 90:18
**numeral** 36:1
**nutshell** 10:1

**O**

**oath** 5:2
**object** 16:8 17:10 19:23 23:23 26:22 30:22 31:8 33:6 36:3 37:24 38:9 41:16 48:16 52:22 54:22 56:17 57:9 61:2,4 65:2 70:12 72:6 73:15 75:24 85:9
**objecting** 33:23 68:20
**objection** 12:25 20:4 21:8 24:18 28:16,24

49:15 50:13 52:12 54:2 56:1,10 65:11 69:11 72:11 76:2,17 77:4 87:17,19
**objections** 7:3 13:4,6 33:5
**objects** 37:11
**observation** 33:10
**obtain** 49:2 52:2
**occur** 60:18
**October** 60:7, 8 64:12,14 73:4
**office** 22:18, 19,23 23:1,4, 25 24:1,2 63:13 99:1
**offices** 22:17
**Official** 30:4
**ointment** 42:4
**opening** 5:8
**operation** 16:7
**opinion** 76:24 86:11
**opportunities** 86:10
**opportunity** 45:18 48:21, 24 83:17,20, 21 88:22
**opposed** 10:14 16:2 31:3 33:12
**opposing** 26:15 49:10 51:17 56:14, 22,25 77:14
**order** 12:22 16:1,12,15, 17,20 17:12, 16 43:5 49:11
62:16,17 78:10,11 79:4 81:23 87:24 93:5 94:4 98:8 99:18
**ordered** 65:8
**orders** 93:16
**ordinary** 19:21
**ore** 16:14 80:1 89:5,18 95:21 96:5
**organization** 19:15
**original** 6:8 9:17 26:23 27:8,9,11,15, 17,19 29:21, 23 30:7 33:20 34:10,12 40:10 42:14
**originated** 40:9
**origination** 38:8
**Orlando** 8:2
**other's** 12:24
**outlines** 24:25
**outstanding** 69:7
**overrule** 24:17 28:24 65:6,11 72:11 77:4
**overruling** 33:24
**oversight** 24:2
**owner** 10:13

**P**

**p.m.** 92:11 93:25 100:3
**pages** 32:21
**part** 6:12 48:6 59:10,12 64:2 74:15 75:19
**partial** 68:8
**parties** 4:2 7:5 15:9 18:23 41:10 49:13 51:20 52:7 80:15, 16,17
**party** 16:23 40:24,25 41:6,15 82:10 93:4,7 98:8, 16 99:10,15
**party's** 45:8 87:12
**pass** 12:9
**passage** 88:25
**past** 25:10,11
**pause** 4:9 27:15 28:14 30:11 62:22 77:11 79:19
**pay** 67:7
**paying** 66:19, 25 67:6
**payment** 21:20 22:1,6,9 23:11,14,15, 17,19 25:10 68:6,7 70:4,6 74:12
**payments** 19:9 20:17 23:11, 13 68:9 70:1 76:4
**pending** 7:11, 20
**people** 22:7 23:9 85:6
**people's** 24:8
**performing** 25:16
**period** 71:20 95:17
**person** 7:22 20:1 30:18,19
**personal** 20:5 21:10 22:2,3 24:1 31:8 39:24 54:23 73:15 75:25
**personally** 21:18,23 61:19 64:12
**personnel** 22:23 55:5
**pertaining** 23:3
**pertains** 51:3
**phone** 7:20 9:3 23:15 90:11,17,19 92:18,21 93:13,18
**physical** 22:15
**pick** 13:20
**pictorial** 12:25 13:9
**place** 20:13, 21 36:1 42:22 43:6,12,15, 24,25 87:25
**plaintiff** 4:12,14 7:10 9:15 10:22 11:6 12:1 14:9,11 16:22,23 18:25 19:3 34:1,21 36:23 37:11 44:19 45:22 46:7,10 47:8 53:12 55:23 57:17, 23 58:14 60:21,22 65:12 66:1,4, 18 68:12 70:19 76:12 79:23,25 80:12 82:1

83:21 86:6,9, 17,20 87:19, 22 88:2,3,4, 9,16,22 89:8, 19,25 90:1 91:2 92:14 96:3,14 97:4, 8,19
**plaintiff's** 5:16,23 7:12 8:1 9:21 10:24 12:15, 23 13:4,11 15:15 17:22 32:23 34:22 42:25 48:24 51:14,18 53:5,19 54:6, 11 56:2,11,14 57:5 59:14 61:10 62:24 63:3 66:15,16 71:10,24,25 76:15 77:5,8 78:4,7,10 81:8 86:1 92:14 93:16 95:6,21 96:18 97:6
**plaintiffs** 31:4 59:14
**plan** 10:19
**plans** 13:1
**playing** 37:6, 12
**pleadings** 15:23 80:18 84:5 85:1,5 95:22
**podium** 14:15
**point** 16:14 28:5 33:24 34:5 36:17 42:8 43:22 44:16,19 46:1,2 54:10 60:17 61:6 66:19,25 74:17 78:12, 14,17 90:25 91:12 98:20
**policies** 20:16,18 21:19 22:10 38:16 39:10, 24 55:7 75:14
**policy** 40:21 41:1
**portfolio** 94:24
**position** 18:8 24:4 42:25 94:13
**possession** 27:17 31:21 48:20 49:2 50:19 53:13
**post-filing** 60:13 61:23 65:15 66:10
**potential** 95:14
**practice** 19:8 32:6 55:16 62:11 64:21, 25
**practices** 19:5 24:13 26:8 58:8,9 64:5
**precedent** 5:11 6:16 9:23 10:4 57:12,13,20, 25 58:2,15 67:11
**predates** 40:5
**predecessor** 74:2 76:14
**predecessors** 59:14 73:23
**predicate** 77:3
**prefer** 14:14 48:9
**preference** 29:5
**prejudice** 45:12
**prepare** 19:17 20:7
**prepared** 12:1 13:11 19:14 46:12 51:24 94:11,22
**present** 4:2 7:17 11:20 12:6 13:1 15:18 16:21 31:10 33:25 48:1 86:19 88:5 95:3
**presentation** 79:25
**presented** 34:1 51:16
**presenting** 9:11 36:23 94:15
**presents** 82:19
**preserved** 21:1
**press** 9:8
**pretrial** 5:7, 22 15:11 51:10 52:8 53:8,9,23 57:5,10 58:18 93:2
**pretty** 15:4 48:4
**previous** 71:2 73:22 74:19 76:14
**previously** 18:2 54:19
**primarily** 22:25
**principal** 68:18 69:6 74:8
**printout** 74:7
**prior** 25:12 30:2 51:9 52:5,8 60:24 70:14,16 73:2 74:6 75:3,9, 17 76:1,17
**problem** 15:5 77:25 85:20
**procedurally** 84:7
**procedures** 20:16,19 21:19 22:10, 13 26:9 38:16 39:10,24 40:21 55:7 75:14
**proceed** 4:13, 15,16 32:5
**proceeding** 99:9
**proceedings** 4:1 100:3
**process** 25:3 32:3 55:2,3 73:8,16,20 74:2,16,17
**produce** 9:16
**produced** 54:1 76:3
**proffer** 11:20
**promissory** 9:17
**pronouncing** 25:23
**proof** 65:3
**properly** 21:5
**property** 63:13 64:12 68:13 78:20
**proposal** 7:12 8:8
**proposed** 17:1 80:23 81:3 86:20 87:3,14 93:5,16
**protocol** 55:6
**prove** 66:6

**proved** 76:24
**provide** 25:6 26:17 39:23 40:6 47:9 99:16
**provided** 11:13 30:2 88:10 97:5 99:16
**public** 39:7 40:13 41:2
**pulled** 81:17
**purchase** 48:13 56:4
**purportedly** 76:8
**purports** 83:14
**purpose** 39:14
**purposes** 29:4 39:6 43:4 49:19 70:22
**pursuant** 64:5
**pursue** 64:9
**put** 5:22 58:13 60:1 62:15,17 69:12 79:6

**Q**

**qualified** 18:20 38:10 64:4
**question** 77:18
**questionable** 94:10
**questioning** 67:21
**quick** 4:6
**quit** 66:25 67:6

**R**

**raise** 4:24 15:6
**raised** 89:1
**raising** 5:3
**Rate** 26:20
**re-send** 64:21
**re-sent** 64:19
**reached** 12:17
**read** 91:7
**reading** 87:17
**ready** 4:4,11, 12,14,16 7:19 8:20 14:8 15:9 51:24 84:21 88:5
**real** 50:10
**realize** 53:16
**reason** 34:6
**reasons** 39:2
**reassign** 44:20
**receipt** 20:15 62:10
**receipts** 20:17
**receive** 21:25 22:6 74:6,7 90:5
**received** 10:1 18:22 23:13, 16,20 32:10 34:22 55:4 56:9,11 63:11,12 64:6 65:9 66:2,7, 16 70:2 71:25 77:8 78:7
**receiving** 73:22
**recently** 48:20 49:2
**recess** 49:22, 23,25 84:4,22 90:13,16 92:9,10 93:25
**recessed** 92:13
**recessing** 85:5
**recognize** 80:25
**recollect** 13:4
**reconvening** 92:12 94:1
**record** 8:1 9:10 10:19 11:12 19:9 21:17 22:12 25:12 26:21 29:4 31:2,18 35:3 36:5 41:2 44:5 67:19 69:12 74:25 76:17 78:12 89:13, 14 96:13 97:4
**recorded** 36:20,25 37:2 42:23 43:3,7 44:5,9
**recording** 37:6
**records** 5:17, 18 19:11,12, 14,18,20 20:7 21:21,22,23, 25 22:4,8,9 23:3,5,9 24:7,9,12,14, 15,16 25:10, 18 26:3,7 29:8 30:4,14 31:19 32:8, 13,15 39:7 40:13 45:18 55:4,11,16 70:14 71:5,7 72:9 74:8,15, 20 75:17 83:7
**refer** 26:11 36:18 55:19 78:9 87:11
**reference** 25:14 36:22 37:11 52:13
**referenced** 50:5
**referred** 25:15 68:4
**referring** 29:13 30:25 31:6 40:2 45:16 69:14
**refers** 78:8
**reflect** 70:4
**reform** 82:4, 15 96:1
**reformation** 81:4,12 84:9, 10 94:17 95:22
**reformed** 82:4 83:9
**regard** 9:23 20:12 38:11 50:9 53:4 57:11 70:13
**registration** 35:10 38:25 39:4,6,25
**regular** 19:8 21:4 25:19 32:6 39:21 55:15 64:16, 19,21
**regularly** 19:21 55:12
**rehearing** 16:14
**relate** 57:13
**relates** 38:24 45:18
**relating** 61:22 95:14
**relationship** 18:25 21:13, 16

**relationships** 51:20
**relative** 20:11
**relief** 16:24, 25 86:22
**rely** 65:12
**remedy** 68:11
**remember** 36:8 51:22 86:3 87:7
**remove** 12:21 97:10
**renders** 91:2
**Renee** 10:21
**renewed** 48:5 96:10
**REO** 36:1 42:22 43:6, 12,24
**reply** 38:13
**report** 71:1 72:21 73:1,11 76:13 94:2,5
**reporter** 15:3
**represent** 18:14,17 93:6
**representation** 72:3
**representative** 18:15 83:7 92:14
**representative's** 81:8
**representatives** 49:13 83:24
**representing** 51:7
**request** 10:8, 12 11:16 17:1,11 43:23 53:6,20 56:15 57:8 60:18,24 86:14,25 87:14,18,22 95:4
**requested** 10:6 11:3 58:11 65:18
**requesting** 63:16
**requests** 16:6 18:20 53:13, 20 64:4 86:4, 5
**require** 7:14 61:15
**required** 24:11 39:9,17 41:2 58:14 64:3 75:21
**requirement** 24:14 65:4
**requirements** 20:13 29:2
**reserve** 20:9 76:16
**RESPA** 64:5 75:21
**respective** 47:21
**respond** 50:17 57:6 62:16 66:1
**responded** 10:11 16:7
**responding** 95:4
**response** 10:1 11:7,16 12:22 53:5,19 56:15 57:4 63:10 64:1,10 66:3 86:20 87:3,14 88:16
**responses** 17:1 18:20 53:13 57:7 64:3
**responsibilities** 18:12 25:1
**responsible** 18:20,21 21:17
**rest** 45:13,14 48:3 80:6 89:8,19,25
**rested** 89:25
**rests** 90:1
**result** 68:11 93:17 95:15, 18
**return** 62:10
**returning** 92:5
**review** 18:13 21:22 30:14 31:22 32:12, 15 45:18 47:4 49:9 53:8 55:6,18 56:16 68:3 72:2 74:2 75:2 93:11
**reviewed** 21:23 25:13 26:3 74:13 98:11
**reviewing** 18:21 21:21 55:2 63:4 94:23
**ridiculous** 85:15
**role** 20:12 41:22
**rolling** 98:15
**Roman** 36:1
**Rouge** 22:20 23:1,2,4
**route** 84:12
**rule** 33:11 65:13 66:6 85:3 86:1 97:21
**ruled** 78:14 80:5 86:22 97:25
**rules** 9:2
**ruling** 20:9 89:5,18 91:20

**S**

**safeguards** 20:21
**satisfied** 57:25
**scan** 52:16
**scanned** 32:9
**scenario** 88:13
**scheme** 41:24
**seats** 14:23
**security** 68:13
**seek** 97:21
**seeking** 56:20 64:9 68:12
**seeks** 97:20
**segment** 82:15
**selected** 47:11
**sell** 90:9
**semi-case** 98:16
**send** 52:17 62:1,11 64:3 75:21 91:13
**sending** 65:2
**sense** 5:15, 22,24
**separate** 33:2 77:14,17
**September** 36:15 42:21 44:3 46:8 76:22
**series** 63:1 66:5 70:21 82:2,16
**served** 28:3
**service** 25:16 39:12
**serviced** 74:6 76:19
**servicer** 18:17 19:2

20:1,19 21:15 55:2 58:22 59:1 70:14,15 71:2 73:2 74:5,6 75:3,9 76:14,18 77:1
**servicer's** 73:16,20 74:20 75:17
**servicers** 47:1 74:2 76:19 81:10 82:11
**services** 19:6 24:21 72:19 73:1
**servicing** 18:7,8,22,24 19:2,5 22:24 23:6 24:20, 24,25 25:1,5, 10,12,15 32:11 38:14, 24 39:2 46:22 55:5,13 58:22 63:2 69:23 70:1,15,24 71:20 73:2,6, 12 74:1,5,8, 15,19,24 75:11,19 76:6
**set** 4:6 35:20 45:16 73:13 98:20
**setting** 14:16
**settle** 7:17
**settlement** 7:6,13,14 8:7 95:14,15,18
**shed** 49:12
**shoes** 90:17
**short** 67:23
**shorthand** 58:17
**shot** 45:10
**shoulders** 24:8
**show** 6:19 12:1,3,5 25:10 34:1 62:19 82:17, 18
**showed** 51:3,6
**showing** 12:12 23:18
**shown** 6:10
**shows** 9:16 33:20 70:6
**side** 13:19 16:4 52:20 72:22 84:24
**sides** 6:22 14:20 99:25
**sift** 41:21
**sign** 32:1
**signature** 32:19,21
**signed** 64:13 79:5 99:18
**significant** 92:21
**silence** 17:16
**simply** 57:19 83:14
**sir** 4:5
**sit** 14:14 81:11
**situation** 90:22
**situations** 16:22 47:17
**sixth** 43:19 44:10 47:6 81:20
**SN** 18:7,8 19:2,4 22:15 24:20 25:15, 16 26:8 31:13 32:6 38:24 39:2 46:22 55:13,16 58:22 63:2 69:23 70:1, 15,24 71:5, 13,20 73:2,5, 12 74:1,18 76:5
**SN'S** 70:17,18
**so-called** 87:24
**sold** 90:8
**somebody's** 14:5
**sort** 44:23
**sounds** 11:4 67:9
**South** 8:2 68:5
**speak** 51:16 92:18
**specific** 10:23 51:13 58:3 83:16
**specifically** 11:18 12:14 38:18 40:17 49:18 65:10 81:14 82:4 86:5 88:13
**specificity** 58:15
**specifics** 79:15
**speed** 90:21
**Spell** 17:24
**spend** 65:15
**spending** 79:8
**spitting** 62:4
**spoke** 94:7,9
**stamp** 30:2,4 99:19,22
**stand** 14:14, 19
**standards** 20:13
**standing** 5:13 9:15 10:22 39:14,18 90:5
**standing/ assignment** 67:10
**standpoint** 5:25
**Starfish** 78:22,23
**started** 6:9 96:21
**state** 58:15
**stated** 40:17 72:4
**statement** 5:7,9,23 53:9 57:10
**states** 42:5
**status** 74:22 90:23
**statute** 29:7
**statutory** 29:1 89:13
**stay** 14:23
**steer** 53:2
**stip** 58:18
**stipulation** 53:24 57:5
**stopped** 41:25
**story** 49:19
**straight** 80:19
**street** 78:20
**stress** 53:18
**strong** 48:4
**strongly** 15:19
**stuck** 92:18
**stuff** 33:21
**subject** 47:4 55:6 68:3 85:12 94:21 97:6
**submit** 11:20 15:10 55:24 76:13
**submitted** 32:24
**subsequent** 16:24 40:4 43:6 47:7 81:25 91:9,13

**subsequently** 41:14 60:19
**subsidiary** 83:5
**substantive** 80:21
**such-and-such** 64:1
**Sugarloaf** 64:23,24
**suggesting** 85:23
**summary** 13:10,15 73:3 74:7 78:11
**supervisory** 7:14
**supplemental** 15:9
**support** 15:14 43:1 76:25 95:5
**supposed** 37:17 51:9
**surrounding** 37:21
**sustain** 31:11 54:2,25 68:23 76:2
**swear** 4:23
**sworn** 5:2 18:3
**system** 20:24 21:4 22:6 23:6,7,18 25:14 39:4,13 72:8 74:14
**Systems** 35:10

**T**

**table** 50:8 89:4
**takes** 95:20
**taking** 95:12
**talk** 40:20 46:18 59:15 73:24 81:18 87:9
**talked** 5:5 7:1 45:1
**talking** 16:9, 13 30:23 35:14,16 36:13 58:16 59:7 85:4 92:22
**technical** 15:11,15,17, 18,21,25 16:1 86:23 87:22, 24
**technically** 84:10
**telling** 50:11 88:8 96:21,24
**tenus** 16:14 80:1 89:5,18 95:21 96:5
**term** 74:18
**terminate** 92:20
**terms** 7:3 29:7 46:25 51:25 61:5
**testified** 18:3 26:9 32:2 38:15 40:4 45:17 54:20 55:7 56:13 68:25 70:23 73:9 76:4
**testify** 4:24 11:15 14:19 19:24 23:24 24:12 31:1 36:10 37:20 38:10 48:21 63:22 64:13 65:1 66:7
**testifying** 5:18 21:8 37:1 71:14,16 73:19
**testimony** 16:8 17:7,20 22:3 26:6 31:17 51:25 71:18 81:7,8 83:13 88:10 94:4,9
**thing** 65:19 89:2,11 91:16
**things** 4:18 13:7 21:9 59:22 61:25 62:11
**thinks** 6:2
**thought** 4:19 5:8 27:2 37:14 66:23 96:23
**tie** 6:20
**time** 4:21 7:1 8:12,15,23 12:25 13:15, 20 19:12 29:23 30:15 31:5,25 40:11 44:20 45:12 46:1,2 49:18, 21 54:1,21 60:19 63:4 65:15 70:20, 23 71:3 73:5 74:24 75:19 79:8,13 85:18 92:4,7 93:12, 21 94:24 95:6 96:20 98:23
**times** 51:17 82:9 83:1
**tiny** 72:20
**tipped** 46:11
**title** 72:21 87:20 88:17
**titled** 69:23 72:19
**today** 8:6 51:8 88:3
**today's** 49:19
**told** 95:24
**tool** 51:19
**totally** 85:9
**training** 22:13
**transfer** 6:10 12:5,7,9 74:4
**transferred** 32:11 73:5 74:24 75:19 76:5
**transfers** 82:13
**transmitted** 30:19
**treat** 12:17
**trial** 4:11,19 8:6 13:14 16:2 20:8 30:2 51:8,12, 25 52:6,24 53:7 54:2 77:22 80:14, 23 84:5 85:6 88:3 89:3 91:1
**true** 10:12 57:15
**trust** 43:18 44:7 46:5 47:7 81:24 88:14 89:13
**trustee** 82:8 83:4,15 88:21 89:12
**trustees** 47:1,11 81:9 82:11
**trustworthiness** 55:8 73:13
**trustworthy** 73:17
**turn** 35:13 90:9
**type** 5:15 23:15 58:25
**types** 41:23

**typically** 5:16 6:8 13:13 45:7 74:4 75:4

U

**ultimately** 28:21 62:23
**unanticipated** 57:4
**unavailability** 99:2
**uncommon** 40:7 47:20
**understand** 20:3 32:4 34:5 42:15 47:24 49:7 51:11 52:25 53:3,17 61:5 64:8 65:22 66:9 67:15 90:23 91:5 92:4
**understanding** 34:12 83:3
**unduly** 53:6
**unpaid** 68:18 69:6
**unusual** 5:16
**update** 39:9 94:5
**updates** 39:18
**upper** 72:22
**urgency** 90:22

V

**valid** 12:6 64:8
**validate** 58:11 60:11
**validity** 12:5
**vehicle** 75:8
**vein** 53:11
**Ventures** 43:13,15,21, 25 44:13 48:15
**verbatim** 87:17
**verdict** 98:1
**verification** 10:24 11:1,17 53:20 55:8 56:15,16 57:6,7 60:18, 23 73:13,21 74:2,25 75:20,23,25
**verified** 10:25 11:8,14 15:22 20:22 23:17 25:4 26:7 75:14,18
**verify** 10:5, 7,12 11:6 73:21 74:23
**verifying** 11:18 74:19, 22
**version** 9:18 27:1,5,6 33:7 58:18 67:23
**versions** 26:25 28:17 29:15 33:25 34:2
**versus** 50:11 92:13
**vibrate** 9:3
**view** 13:19 24:3
**violation** 9:1 58:7
**virtue** 24:4 91:6
**visibility** 69:16
**voluntarily** 96:8
**voluntary** 96:14 97:20 98:3

W

**Wachovia** 40:11,17 41:13
**wait** 59:21 93:12 96:16 99:21
**waiting** 52:23 81:2 90:17
**waive** 75:10
**waived** 75:6
**waiving** 87:19
**wanted** 7:5 8:13 29:22 37:24 44:16 48:8 54:16 66:1 71:3 78:12,14 81:1 92:23
**waste** 79:12
**Wayne** 5:1 9:13 25:22 32:14,17 64:11
**ways** 84:16,17 85:22,24 86:2
**weakness** 6:2
**weight** 48:22 49:8 81:7
**well-taken** 52:13
**well-versed** 38:16
**Wells** 35:10, 25 36:14,20 38:6 40:3,19 41:8,9,11,14 42:22 43:5
**west** 22:18
**whatsoever** 41:5
**whichever** 27:6
**william** 5:1 17:22 18:1
**win** 91:15
**wire** 23:16
**withdrew** 87:23
**witness's** 7:17
**witnesses** 4:23 5:6 84:23,25
**wondering** 79:8
**words** 20:3
**work** 91:17
**works** 29:11 71:17 74:3
**worse** 41:23
**worth** 8:19 45:10
**writing** 10:15 60:23 84:6
**written** 18:20 20:16,18 21:19 38:17 53:5,13,19 63:9 64:3,4
**wrong** 6:1 78:19

Y

**year** 16:6 33:19 89:1
**years** 33:20 51:2 85:10 91:11
**yesterday** 8:8,10 49:4 51:17 58:20 72:20 85:14
**you-all** 7:23 12:16 52:9 91:23 99:8

**Z**

**zone** 8:12,15